*Denise L, Savage, Esq.* (S.C. Bar No. 102567)
dsavage@savagelitigation.com
**Savage Law, PLLC,** *Attorneys for Plaintiff Rob Star, derivatively and on behalf of Oldfield Community Association, LLC and Oldfield Club, LLC as Nominal Defendants*
**500 Carteret Street**
**Beaufort, South Carolina 29902**
**Phone: (843) 522-0058**
**Fax: (843) 522-2152**

### UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH CAROLINA
### BEAUFORT DIVISION

| | |
|---|---|
| **ROB STAR, DERIVATIVELY AND ON BEHALF OF ALL NOMIMAL DEFENDANTS, OLDFIELD COMMUNITY ASSOCIATION, LLC AND OLDFIELD CLUB, LLC, AND ON BEHALF AND FOR OLDFIELD COMMUNITY ASSOCIATION, LLC'S AND OLDFIELD CLUB, LLC'S RESPECTIVE MEMBERS,**<br><br>**Plaintiff,**<br><br>v.<br><br>**TI OLDFIELD DEVELOPMENT, LLC, AND TI OLDFIELD OPERATIONS, LLC, BY AND THROUGH THEIR RESPECTIVE BOARD OF DIRECTORS, JOHN DOES 1-10, INDIVIDUALLY AND AS DIRECTORS BETWEEN THE TIME PERIODS 2010-2017 including PHILLIP GALBREATH and I. WILLIAM STOLZ, III; OLDFIELD HOLDINGS GA, LLC; SF CAPITAL, LLC; SF OPERATIONS LLC; JAMIE D. SELBY, INDIVIDUALLY AND AS MANAGING MEMBER OF ELLIOT GROUP HOLDINGS, LLC; ELLIOT GROUP HOLDINGS, LLC; OLDFIELD COMMUNITY COUNCIL (2013-2015), including JAY BARR and RICHARD PRICE, BY AND THROUGH ITS RESPECTIVE BOARD OF DIRECTORS, JOHN DOES 11-20; OLDFIELD CLUB (2010-2017), BY AND THROUGH ITS RESPECTIVE BOARD OF DIRECTORS, JOHN DOES 21-30, including JAY BARR, PHILLIP GALBREATH and I. WILLIAM STOLZ, III; AND OLDFIELD COMMUNITY ASSOCIATION (2010-2017), BY AND THROUGH ITS RESPECTIVE BOARD OF DIRECTORS, JOHN DOES 31-40 including RICHARD PRICE, PHILLIP GALBREATH and I.** | **CIVIL ACTION NO: 9:17CV2489(DCN)**<br>**(DERIVATIVE ACTION)**<br><br>***(RELATED ACTIONS)***<br>**(CIVIL ACTION NO.: 9:17-CV-452-DCN)**<br>**(CIVIL ACTION NO.: 9:17-CV-794-DCN)**<br><br><br>**(Jury Trial Demanded)** |

| WILLIAM STOLZ III; BALD EAGLE PARTNERS, LLC and BEP OLDFIELD, LLC, BY AND THROUGH THEIR RESPECTIVE BOARD OF DIRECTORS (JOHN DOES 41-50) **Defendants,** -and- OLDFIELD COMMUNITY ASSOCIATION, LLC AND OLDFIELD CLUB, LLC, **Nominal Defendants.** | |
|---|---|

### ROB STAR'S VERIFIED <u>AMENDED</u> COMPLAINT DERIVATIVELY AND ON BEHALF OF NOMINAL DEFENDANTS, OLDFIELD COMMUNITY ASSOCIATION, LLC AND OLDFIELD CLUB, LLC

Derivative Plaintiff, Rob Star ("**Derivative Plaintiff**"), derivatively and on behalf of nominal defendants, Oldfield Community Association, LLC and Oldfield Club, LLC, (collectively, the "**Nominal Defendants**"), by and through their undersigned attorneys, submit this Verified Amended Complaint in Intervention (the "**Plaintiff's Amended Complaint**") and represent and allege as set forth below:

### <u>THE PARTIES</u>

1. Derivative Plaintiff, Rob Star, is a resident of South Carolina and of Oldfield Community ("**Oldfield**"), and was, at all relevant times herein, a social member of OCA and Club Member of OC.

2. Nominal Defendant, Oldfield Club ("**OC**") is a non-profit corporation organized under the laws of South Carolina is and Oldfield Holdings GA, LLC located in Beaufort County and governed by its board of directors.

3. John Does 21-30 (the "OC Director(s)"), defendants herein, comprise members of the Board of Directors of OC from 2010 through 2017.

4. Nominal Defendant, Oldfield Community Association ("**OCA**"), is a non-profit corporation organized under the laws of South Carolina and located in Beaufort County

and governed by its board of directors.

5.  John Does 31 through 40 (the "**OCA Director(s)**"), defendants herein, comprise members of the Board of Directors of OCA from 2010 through 2017.

6.  Oldfield Community Council ("**OCC**"), a defendant herein, is a dissolved non-profit corporation originally organized under the laws of South Carolina.

7.  John Does 11-20 (the "OCC Director(s)"), defendants herein, comprise members of the Board of Directors of OCC from 2013 through 2015.

8.  SF Capital, LLC ("**SF Capital**") and SF Operations LLC and Oldfield Holdings GA LLC ("**Oldfield Holdings"**) (collectively, "**SF Operations**," together with SF Capital, "**SF**"), are each Georgia limited liability companies and, upon information and belief, a parent company or affiliate of TI Oldfield Development, LLC and TI Oldfield Operations, LLC (collectively, "**TI**," together with SF, the "**SF Companies**").

9.  The SF Companies are, respectively, Georgia limited liability corporations whose registered agent is I. William Stolz, III ("**Stolz**") at SF Capital's address and were and are successors-in-interest to the Crescent Resources, LLC, the original Sponsor of Oldfield.

10. John Does 1-10 (hereinafter the "**TI Directors**"), defendants herein, are, upon information and belief, and for all relevant times herein, members of TI's Board of Directors and/or were placed on OC's and OCA's Board of Directors as the Sponsor's director, and are citizens and residents of various states, including the State of South Carolina and the State of Georgia.

11. Stolz, a defendant herein, is a principle of the SF Companies and has served as a board member of one or more of the SF Companies, OCA and OC and has served as a board member of TI, OCA and OC during all relevant times herein.

12. Phillip Galbreath ("**Galbreath**"), a defendant herein, is, upon information and belief, a principle in one or more of the SF Companies and has served as a board member of TI, OCA and OC during all relevant times herein.

13. Richard Price ("**Price**"), a defendant herein, is a resident of Oldfield and was, at all relevant times herein, an OCA Director(s) and OCC Director(s).

14. Jay Barr ("**Barr**"), a defendant herein, is a resident of Oldfield and was, at all relevant times herein, a member of the OC Board of Directors and the OCC Board of Directors.

15. Jamie Selby ("**Selby**"), a defendant herein, was, at all relevant times herein, the general manager of OC, the subject of an employee contract with TI (as employer) and is a principle of Elliot Group Holding LLC ("**EGH**"), which is now title owner of the so-called Greeter's Store.

16. EGH, a defendant herein, is a South Carolina corporation formed by Selby to, upon information and belief, acquire the "Greeters Store," a property at issue in this lawsuit.

17. Bald Eagle Partners, LLC and BEP Oldfield, LLC (collectively, "**BEP**"), named defendants herein, are Maryland and Delaware corporations and the purchasers of certain parcels in Oldfield from TI.

18. John Does 41-50 (the "**BEP Directors**"), defendants herein, comprise members of BEP's Board of Directors for the period 2013 through 2017.

## JURISDICTION AND VENUE

19. The United States District Court for the District of South Carolina has subject-matter jurisdiction over the claims in this lawsuit under 28 U.S.C. §§1331 and 1357.

20. The United States District Court for the District of South Carolina has personal jurisdiction over the parties pursuant to 28 U.S.C. §1332.

21. Venue is proper in the United States District Court for the District of South Carolina, Beaufort Division, pursuant to 28 U.S.C. § 1391.

**STANDING**

**A. OCA and OC Incompetence and Conflicts to Pursue Action**

22. Oldfield is a residential and golf community located in Bluffton, South Carolina.

23. OC and OCA are organizations provided for in the covenants at Oldfield. OC operates recreational and social facilities at Oldfield pursuant to a certain "Declaration of Recreational Covenant for Oldfield Club," dated November 17, 2000 (the "**OC Declaration**" or "**OC Governing Documents**"), and as provided in the covenants. OCA operates all other Club Property not otherwise demarcated as "Club Facilities."

24. TI/SF is the successor developer/Sponsor of Oldfield.

25. The Oldfield Community is located in Beaufort County, South Carolina. This community of individual lots and common property was created with the recording of the "Declaration of Covenants, Conditions, and Restrictions for Oldfield," (the "**OCA Declaration,"** together with the OC Declaration, the "**Oldfield Governing Documents**") recorded in the R.M.C. Office for Beaufort County in Book 1354 at Page 1359 on November 17, 2000, by Oldfield, LLC, as the original developer. The covenants, conditions and restrictions set forth in the Oldfield Governing Documents run with the land and are incorporated by reference in every deed of real estate owned by the homeowners and members of the OC and OCA today, both individually and in common. The Oldfield Governing Documents, together with any amendments thereto, are incorporated herein by reference and are hereby made part of Derivative Plaintiff's Amended Complaint.

26. Oldfield has been and is presently governed by its current board of directors (hereinafter referred to as "**OCA Board**") by virtue of its articles of incorporation, its OCA Governing Documents, and the South Carolina Nonprofit Corporation Act. The OCA Board is vested with the authority to administer the common property, to make necessary claims, and to commence legal actions to protect the property rights of its members, including actions to enforce the provisions of the OCA Governing Documents. The OCA Board is charged with a fiduciary duty to maintain and protect its members' property interests. The OCA Board meets regularly and conducts business in Beaufort County, South Carolina.

27. The Oldfield recreational facilities have been and are presently governed by its current board of directors (hereinafter referred to as "**OC Board,**" together with the OCA Boards, the "**Boards**") by virtue of its articles of incorporation, its OC Governing Documents, and the South Carolina Nonprofit Corporation Act. The OC Board is vested with the authority to administer the common property, to make necessary claims, and to commence legal actions to protect the property rights of its members, including actions to enforce the provisions of the OC Governing Documents. The OC Board is charged with a fiduciary duty to maintain and protect its members' property interests. The OC Board meets regularly and conducts business in Beaufort County, South Carolina.

28. The Nominal Defendants, both South Carolina nonprofit corporations, were formed for the benefit of its members who are homeowners and lot owners. The members of OCA and OC were, by virtue of their ownership of this property within Oldfield community, directly and adversely affected by the decisions and actions of all Defendants through the OCA and OC Boards and the John Doe Directors of those boards before the developer

turnover of OC Club facilities at end of 2015 ("**Turnover**") and after Turnover

commencing in late December 2015. In the case of Defendants Selby and EGH, the

Nominal Defendants and their members were adversely affected by their wrongful acts

during parts of 2016 as well.

### B.  The Derivative Plaintiff's Standing

29. Likewise, the Oldfield members (i.e. Members of OCA, Social Members and Equity Golf

Members of OC (collectively, the "**Oldfield Members**")) were not only adversely and

detrimentally effected by the SF Companies, BEP, Selby and other co-Defendants, but

also by the complicit action and inaction of the OCA and OC Boards with the SF

Companies, BEP, Selby and other co-Defendants to perpetuate the fraud and misconduct

by the SF Companies, BEP and Selby.

30. Such breach of fiduciary duty, complicit fraudulent conduct, and other allegations set

forth more fully below, in addition to the OCA and OC Boards failure to pursue recovery

of dues from BEP, failure to assert OCA rights in the Greeter's Property (defined and

discussed more fully below), and failure to assert additional claims against co-Defendants

herein, render the present OCA and OC Boards incompetent to and conflicted from

bringing this Action.

31. Further, given the absolute and complete domination of the OCA and OC Boards by TI

from 2010 through the present, and OC and OCA Board's members continued complicit

conduct in fraud and improprieties perpetrated by TI since the post 2015 Turnover by TI

to OC, it is clear that the Derivative Plaintiff has standing in commencing and

prosecuting this action derivatively and on behalf of OC and OCA as the Nominal

Defendants herein.

32. Finally, because the present OCA and OC Boards have fulfilled any purported contractual conditions precedent of negotiations and alternative dispute resolution with the SF Companies under the Governing Documents, thus enabling the OCA and OC Boards to bring this action in the first instance on behalf of its constituent homeowners, it is respectfully submitted that the Derivative Plaintiff has standing to bring this Action against the Defendants on behalf of, and in the best interests, of OCA and OC and the Oldfield Members.

33. Finally, certain Equity Golf Members of OC were to join this Complaint but, two (2) days before the filing of this Complaint, TI and OC offered these Golf Equity Members a "confidential agreement" to execute to resolve their membership issues with the OC's unwillingness to release and affirmatively sell such Equity Golf Members' membership from their long resigned membership, in exchange for not joining this Complaint.  This action smacks of bad-faith and the collusion committed by OC and TI, as it can be viewed as nothing other than an attempt to hide the misconduct by TI and OC and undermine the Derivative Plaintiff's standing in this Action.

   i.    <u>The South Carolina NonProfit Corporation Act</u>

34. OC and OCA are nonprofit limited liability companies formed pursuant to the South Carolina Nonprofit Corporation Act (S.C. Section 33-31-101, *et. seq.)*

35. Pursuant to the OC and OCA Articles of Incorporation (¶4), [these] corporations will have members without certificates or shares of stock."

36. A "Member," as defined under S.C. Section 33-31-140(23), means "a person entitled, pursuant to a domestic or foreign corporation's articles or bylaws, without regard to what a person is called in the articles or bylaws, to vote on more than one occasion for the

election of a director or directors or any other matter which under the terms of this chapter requires approval by the members."

37. Pursuant to S.C. Section 33-31-304(b), the validity of corporate action (i.e. ultra vires acts) may be challenged on the ground that the corporation lacks or lacked power to act via "a proceeding against the corporation to enjoin an act where a third party has not acquired rights." Such an action may be brought by a member or members in a derivative proceeding. S.C. 33-31-304(b).

38. Pursuant to S.C. 33-31-304(c), "[a] corporation's power [i.e. ultra vires acts] to act may be challenged in a proceeding against an incumbent or former director, officer, employee or agent of the corporation. The proceeding may be brought by […] derivatively…"

39. Pursuant to S.C. Section 33-31-630, entitled "Derivative Suits," [d]erivative suits may be maintained on behalf of South Carolina corporations in federal and state court in accordance with the applicable rules of civil procedure."

40. S.C. Section 33-31-831, provides in relevant part:

**Section 33-31-831 - Director conflict of interest.**

**Universal Citation:** SC Code § 33-31-831 (2012)

(a) A conflict of interest transaction is a transaction with the corporation in which a director of the corporation has a direct or indirect interest. A conflict of interest transaction is not voidable or the basis for imposing liability on the director if the transaction was fair to the corporation at the time it was entered into or is approved as provided in subsections (b) or (c).

(b) A transaction in which a director of a public benefit or religious corporation has a conflict of interest may be:

(1) authorized, approved, or ratified by the vote of the board of directors or a committee of the board if:

(i) the material facts of the transaction and the director's interest are disclosed or known to the board or committee of the board; and

(ii) the directors approving the transaction in good faith reasonably believe that the transaction is fair to the corporation; or

(2) approved before or after it is consummated by obtaining approval of the:

(i) Attorney General; or

(ii) the circuit court for Richland County in an action in which the Attorney General is joined as a party; or

(c) A transaction in which a director of a mutual benefit corporation has a conflict of interest may be approved if:

(1) the material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board and the board or committee of the board authorized, approved, or ratified the transaction; or

(2) the material facts of the transaction and the director's interest were disclosed or known to the members and they authorized, approved, or ratified the transaction.

(d) For purposes of this section, a director of the corporation has an indirect interest in a transaction if:

(1) another entity in which the director has a material interest or in which the director is a general partner is a party to the transaction; or

(2) another entity of which the director is a director, officer, or trustee is a party to the transaction.

(e) For purposes of subsections (b) and (c) a conflict of interest transaction is authorized, approved, or ratified if it receives the affirmative vote of a majority of the directors on the board or on the committee who have no direct or indirect interest in the transaction, but a transaction may not be authorized, approved, or ratified under this section by a single director. If a majority of the directors on the board who have no direct or indirect interest in the transaction vote to authorize, approve, or ratify the transaction, a quorum is present for the purpose of taking action under this section. The presence of, or a vote cast by, a director with a direct or indirect interest in the transaction does not affect the validity of any action taken under subsections (b)(1) or (c)(1) if the transaction is otherwise approved as provided in subsection (b) or (c).

(f) For purposes of subsection (c)(2), a conflict of interest transaction is authorized, approved, or ratified by the members if it receives a majority of the votes entitled to be counted under this subsection. Votes cast by or voted under the control of a director who has a direct or indirect interest in the transaction, and

10

votes cast by or voted under the control of an entity described in subsection (d)(1), may not be counted in a vote of members to determine whether to authorize, approve, or ratify a conflict of interest transaction under subsection (c)(2). The vote of these members, however, is counted in determining whether the transaction is approved under other sections of this chapter. A majority of the voting power, whether or not present, that are entitled to be counted in a vote on the transaction under this subsection constitutes a quorum for the purpose of taking action under this section.

(g) The articles, bylaws, or a resolution of the board may impose additional requirements on conflict of interest transactions.

41. While S.C. Section 33-31-834, entitled "Immunity from Suit," provides that while directors of a nonprofit corporation are generally immune for suits, "[t]his immunity from suit is removed when the conduct amounts to willful, wanton, or gross negligence. Nothing in this section may be construed to grant immunity to the not-for-profit cooperatives, corporations, associations, or organizations."

42. As set forth hereinbelow, the Derivative Plaintiff alleges facts that the directors serving on the boards of the OCA and OC from 2010 through the present, engaged in conduct that was and is willful, wanton and grossly negligent and ultra vires in nature.

ii. Oppressed Shareholders

43. Pursuant to S.C. Section 33-31-140(23), a "Member" means "a person entitled, pursuant to a domestic or foreign corporation's articles or bylaws, without regard to what a person is called in the articles or bylaws, to vote on more than one occasion for the election of a director or directors or any other matter which under the terms of this chapter requires approval by the members."

44. For all intents and purposes, the "Members" of OC and OCA are "shareholders" as they have the requisite voting rights and powers of shareholders in the OC and OCA.

45. Furthermore, as the OC and OCA are not "publicly held corporations" they are implicitly "closely held corporations."

46. Accordingly, the Derivative Plaintiff derives standing on the basis of being a long oppressed shareholder of OC and OCA.

SC Code § 33-18-400 (2012) provides in relevant part:

(a) Subject to satisfying the conditions of subsections (c) and (d), a shareholder of a statutory close corporation may petition the circuit court for any of the relief described in Section 33-18-410, 33-18-420, or 33-18-430 if:

(1) the directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, fraudulent, or unfairly prejudicial to the petitioner, whether in his capacity as shareholder, director, or officer of the corporation;

(2) the directors or those in control of the corporation are deadlocked in the management of the corporation's affairs, the shareholders are unable to break the deadlock, and the corporation is suffering or will suffer irreparable injury or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally because of the deadlock; or

(3) there exist grounds for judicial dissolution of the corporation under Section 33-14-300.

SC Code § 33-18-410 (2016) provides in relevant part:

(a) If the court finds that any grounds for relief described in Section 33-18-400(a) exist, it may order one or more of the following types of relief:

(1) the performance, prohibition, alteration, or setting aside of any action of the corporation or of its shareholders, directors, or officers of or any other party to the proceeding;

(2) the cancelation or alteration of any provision in the corporation's articles of incorporation or bylaws;

(3) the removal from office of any director or officer;

(4) the appointment of any individual as a director or officer;

(5) an accounting with respect to any matter in dispute;

(6) the appointment of a custodian to manage the business and affairs of the corporation;

(7) the appointment of a provisional director who has all the rights, powers, and duties of an elected director to serve for the term and under the conditions prescribed by the court;

(8) the payment of dividends;

(9) the award of damages to any aggrieved party.

(b) If the court finds that a party to the proceeding acted arbitrarily, vexatiously, or otherwise not in good faith, it may award other parties their reasonable expenses, including counsel fees and the expenses of appraisers or other experts, incurred in the proceeding.

47. Controlling shareholders owe a fiduciary duty to minority shareholders. S.C. Code §§33-8-300 and 33-8-420. *See Mason v. Mason*, 412 S.C. 28 (Ct.App. 2015).

48. Thus, in *Kiriakides v. Atlas Food Systems & Services*, 343 S.C. 587, 541 S.E.2d 257 (2001), the Supreme Court established how a court should determine whether majority shareholders have acted oppressively within the meaning of section 33-14-300.  The *Kiriakides* court determined that in establishing the proper considerations for finding oppression, the Court observed that "the terms 'oppressive' and 'unfairly prejudicial' are elastic terms who meaning varies with the circumstances presented in a particular case." *Id.* at 343 S.C. at 602. The Court further noted that the assertion as to whether a shareholder is oppressed is a case-sensitive review and should therefore be determined through a "case-by-case analysis, supplemented by various factors which may be indicative of oppressive behavior."  Several commonly considered factors include "eliminating minority shareholders from the directorate or excluding them from employment[.]…failure to enforce contracts for the benefit of the corporation [and] withholding information from minority shareholders." *Id. at 605, n. 28.*

49. A review of the facts set forth herein and the respective Complaints filed by the OC and OCA reveal that: (a) TI has and continues to dominate the OC and OCA Boards; (b) TI made secret and undisclosed deals with Jamie Selby and EH when selling the Greeter's Store and parcel; (c) TI illegally converted the Greeter's Store and parcel, an asset of OCA, by carving out the store and parcel at the time of Turnover and selling the parcel as a purported asset of the OC (which it is not) and keeping all proceeds from the sale; (d) TI entered into a surreptitious and as of still undisclosed and unrecorded agreement with BEP, and to the distinct disadvantage of OC and OCA, waiving BEP's obligation to pay OC member dues four (4) years (i.e. through October 2017) on the 108 parcels purchased by BEP from TI, and of which thirty (30) of these BEP Lots are not subject to dues in perpetuity; (e) TI failed to pay operating deficits and make the necessary capital expenditures to "turnover" a "first class golf club and course," as required under the OC Governing Documents; (f) OC failed to enforce its rights under the Transfer Agreement to stop the premature turnover of Club Facilities upon the failing of TI to satisfy all turnover pre-conditions;  (g) OCA failed to assert its rights and interest in the Greeter's Store upon discovering the surreptitious sale thereof; (h) The Golf Clubhouse overhead was shifted to Social facilities when the Board realized they need $150,000 in repairs, which action was never voted upon; (i) Since the filing of the Motion, the OC Board, without adequate explanation to the Club Members of legal ramifications or of their respective rights under Section 5.4 of the Turnover Agreement (and waiver thereof)[1],

---

[1] Section 5.4 of the Transfer Agreement provides:

5.4. Operating Expenses. ·

The Sponsor shall fund all cumulative net operating deficits of the Club prior to the Turnover Date and shall be entitled to all operating income of the Club prior to the Turnover Date, except to the extent required to be

procured approval from the Club Members to impose a $5000.00 fee on each Equity Golf Club Member to pay for infrastructure expenditures and operating deficits that were incurred pre-turnover and should have been paid by TI as a condition of Turnover. Upon information and belief, the OC Equity Golf Member approval of this assessment was a Hobson's choice for the OC Equity Golf Members as they were told if the assessments were not approved, the OC would raise dues to obtain the $500,000.

50. The $5000.00 assessment serves only to enrich TI, yet again. The $5000.00 assessment per Equity Golf Member was engineered by the current OC Board of Directors and TI (an OC Board member with *super-veto power*) to cover the pre-turnover capital improvements and operational deficiencies that were mandated to be paid by TI prior to Turnover. Further, by compelling the $5000.00 assessment payment from each OC Equity Golf Member, the Equity Golf Members are being compelled to shoulder rehabilitation of the Golf course which will further enrich TI as they seek to sell their undeveloped lots, unsold golf memberships and seek to enhance their market values.

51. Additional facts set forth in this Complaint reflect the misconduct, collusion and malfeasance by TI and the TI controlled OC and OCA Boards to the detriment of the OCA and OC members, of which the Derivative Plaintiff is a member, respectively.

52. Thus, the facts in this case demonstrate that TI and the TI controlled board have oppressed the minority shareholders to their personal detriment and to the detriment of the Oldfield community.

---

deposited in the Club Fund pursuant to Section 5.9. **There shall be no assessment of the Club's members for operating deficits or capital expenditures prior to the Turnover Date. (**Emphasis added).

### iii. Derivative Standing

53. Rule 23(b)(1) of the South Carolina Rules of Civil Procedure, which mirrors Rule 23.1 of

the Federal Rules of Civil Procedure, provides:

> SCRCP 23(b)(1). **Derivative Actions by Shareholders.**
>
> **(b)(1) Derivative Actions by Shareholders.** In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs.

SCRCP §23(b)(1).

54. The Derivative Plaintiff hereby represents that he was and continues to be an OC and

OCA member at all relevant times herein.

55. The Derivative Plaintiff hereby represents that this action is not a collusive one to confer

jurisdiction that the court would otherwise lack.

56. Pursuant to Rule 23(b)(1), SCRCP, a shareholder who initiates a derivative suit on behalf

of the corporation "shall… allege with particularity the efforts, if any, made by the

plaintiff to obtain the action he desires from the directors or comparable authority…and

the reasons for his failure to obtain the action or for not making the effort." As a

precondition for bringing a derivative action under Rule 23(b)(1), the plaintiff must make

a demand on the board which the board refused or allege facts sufficient to show that a demand would have been futile. *See Thompson v. Thompson*, 214 S.C. 61, 61, 51 S.E.2d 169, 173 (1948); *Carolina First Corp. v. Whittle*, 343 S.C. 176, 539 S.E.2d 402 (Ct. App. 2000).

57. South Carolina courts have upheld Rule 23 demand requirements with an important exception: "At a minimum, a demand must identify the alleged wrongdoers, describe the factual basis of the wrongful acts and the harm caused to the corporation, and request remedial relief." *Whittle*, 343 S.C. at 189, 539 S.E.2d at 409. However, "[d]emand may be excused… if the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment." Id. at 195, 539 S.E.2d at 413; *see also Rales v. Blasband*, 634 A.2d 927, 932-937 (Del. 1993); *Aronson v. Lewis*, 473 A.2d 805, 812-818 (Del. 1984); *White v. Panic*, 783 A.2d 543, 551 (Del. 2001); *Wesenberg v. Zimmerman and Federated Department Stores, Inc*., 2002 WL 1398539 at *3 (D. Minn. 2002) (After the plaintiff pleads particularized facts alleging demand futility, then "[a] demand is considered futile and may be excused…if the particularized facts… create a reasonable doubt that: (1) the directors are disinterested and independent; or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."); *Allison ex rel. General Motors Corp. v. General Motors Corp.*, 604 F. Supp. 1106, 1112 (D. Del. 1985) ("[T]he shareholder must either make a demand or plead with particularity the exceptional circumstances that demonstrate why a demand would be futile, i.e., why the Board of Directors should not be allowed to decide whether to institute litigation.").

"Particularized allegations" are more than notice pleading and must include the specific

facts that support the conclusions the plaintiff wishes to draw from those facts. Id. at 188, 539 S.E.2d at 409.  (quoting *Zimmerman ex. rel. Priceline.com, Inc. v. Braddock*, 2002 WL 31926608, at *7 (Del. Ch. Dec. 20, 2002)). In other words, "[v]ague or conclusory allegations do not suffice to upset the presumption of a director's capacity to consider demand." *Id*.

58. Since prior to Turnover of the OC Club Facilities (defined below) by TI to OC, repeated demands have been made by the Derivative Plaintiff and other OC and OCA members to obtain accurate accounting of utilization of funds by and between the OC and OCA, to sue the SF Companies and BEP for fraud and other claims in connection with the sale of Oldfield lots by TI to BEP and the resulting failure of BEP to pay any social membership fees to the OC since the 2013 sale (the "**BEP Transfer**"), to pursue certain present and former board members arising from ultra vires acts and breach of fiduciary duty, among other demands.

59. Such Demands by the Derivative Plaintiff include, but are not limited to, the documents annexed hereto as **Exhibit 1** (the "**Star Demands**").  Demands by Robert Weinfeld (among other Oldfield residents), an Oldfield resident and OC and OCA member at all relevant times herein, are annexed hereto and made a part hereof as **Exhibit 2** (the "**Weinfeld Demands**," together with the Star Demands, the "**Demands**").

60. Further demand was made by the Derivative Plaintiff on the OC and OCA Boards to: commence breach of fiduciary duty actions against directors (particularly Richard Price and Jay Barr) and of the OC and OCA Boards of Directors both pre and *post-Turnover*, negligence and fraud actions against OC and OCA Board of Directors both pre and *post-Turnover*, RICO claims, contract claims against TI arising from illusory and

unconscionable OC and OCA Governing Documents, appointing a receiver, seek recovery of BEP (and from TI, in the alternative) waived fees and dues from 2013 through 2018, fraud claims arising under Title XIV, Section 1401, *et.seq.* arising from the inaccurate and fraudulent Property Report (defined below) filed by TI, among other claims set forth herein, by way of the Derivative Plaintiff's repeated request to intervene in the pending OC and OCA Actions before this Court, by the filing of a Motion to Intervene with a proposed complaint reflecting the additional demands by the Derivative Plaintiff.

61. Members of the OCC, the oversight corporation formed and participated in by common OC and OCA members, repeatedly tried to obtain accounting information from the OC and OCA so the OCC members could engage in due diligence to determine if Turnover was warranted under the Transfer Agreement. To this end, the OCA provided $10,000.00 to the OCC to engage in due diligence with respect to the proposed Turnover of Club Facilities by TI to the OC. Common directors on both the OC and OCC boards instead used the funds for attorneys' fees to discuss a so-called Dues Lockdown relating to the BEP assessments payments (which were waived for 4 years unilaterally by TI and which assessment waiver TI threatened to extend beyond the 4-year waiver termination date in October 2017). To this day, the OC and OCA have not sought any legal relief with respect to recovering funds relating to the improper waiver of assessments owned by BEP (or TI)). Accordingly, no due diligence was undertaken by the OCC board and the OCA and OC boards have been toothless in connection with all of SF's misconduct.

62. Thus, former members and participants in OCC *personally* financed the retention of Ian Ford, Esq. to undertake an evaluation of the Turnover issue and provide an evaluation of

the members' rights in connection with stopping a pre-mature turnover. Former

Directors of the OC and OCA undermined these members' attempts to stop a pre-mature

Turnover by loudly disrupting meetings between the funding members and Mr. Ford.

Against Mr. Ford's recommendation to file an injunction before turnover, the OC

approved Turnover without undertaking any due diligence.

63. While the present OC and OCA Boards are pursuing claims against pre-Turnover OC and

OCA Board of Directors and some claims against the SF Companies and BEP, one of the

most important claims asserted is that TI has been liquidating assets and attempting to

render itself judgment-proof. Yet, while the OC and OCA filed the complaints (now

pending before this Court via removal under 28 U.S.C. §1441) in January and February

2017, respectively, in which complaints they sought an injunction to enjoin TI from

transferring any assets in an attempt to render itself judgment-proof, neither the OC or

OCA Nominal Defendants have moved before this Court for the actual imposition of an

injunction, even though the OCA and OC Boards have told their members they have the

injunction or a "stay" in place with TI, which they never had filed with or so-ordered by

this Court. In the meantime, upon information and belief, TI has been transferring assets

since the commencement of the OC and OCA state court actions with impunity.

64. The Derivative Plaintiff and other members have also demanded that TI disclose the

unrecorded agreement with BEP, to no avail, and to unwind the illegal conversion of the

Greeter's Store to the OC and then sale to EH.

65. As discussed hereinabove, most recently, the OC Board assessed the $5000.00

assessment imposed against the OC Equity Golf Members, in violation of the express

terms of Section 5.4 of the Transfer Agreement.

66. Counsel for the Derivative-Plaintiff notified OC's counsel in writing of the Equity Golf Members objections to the assessment, that the assessment not only violates the rights of Equity Members under Section 5.4 of the Transfer Agreement, but risks legal ramifications that could estop the Equity Golf Members from recovering these funds, arising under the "voluntary payment doctrine," which has been asserted as a basis for summary judgment in the OC and TI's pending motions for summary judgment in the State Action.  Upon information and belief, the OC Board intends to continue imposing this improper assessment, and is now incurring interest and penalties against Equity Golf Members who fail to pay the assessment.  The OC has also told the community that Equity Golf Members that do not pay the assessment will lose all Club privileges, regardless of whether they are up to date on their dues.

67. Manifestly, TI has controlled and continues to control the OC and OCA Boards and, upon information and belief has orchestrated the $5000.00 assessment against Equity Members knowing these funds will be used for pre-turnover operating deficits and capital improvement expenditures that TI was obligated to pay prior to Turnover, and further knowing that it will assert the "voluntary payment doctrine" to estop reimbursement of the $500,000 accrued from the individual $5000.00 assessment against Equity Golf Members.

68. Based upon all of the foregoing acts, it is clear that the repeated Demands by the Derivative Plaintiff and other Oldfield members, which were made to the OC and OCA boards to demanding that they take action against TI, BEP and to stem the improper fluid transfer of funds by the OCA and the use of OC Social Members' dues for use by the OC for Club Facilities, among other claims, have been ignored.

## BACKGROUND

### A.  The Development of Oldfield

69. In 2000, the original developer, Oldfield, LLC, set out a plan to subdivide eight-hundred fifty (850) acres in Beaufort County, South Carolina, into what will ultimately contain approximately five hundred forty (540) residential homes, a golf course, and various other amenities, including pools, eating and meeting facilities, and an outfitters center with hiking trails. Thereafter, the original developer and, subsequently, the SF Companies marketed and sold lots in the Oldfield community.

70. In approximately 2010, Oldfield, LLC (via Crescent), sold and/or assigned all of its remaining lots and development rights to TI.  TI functioned through their appointed John Doe Directors from approximately 2010 until the beginning of 2016. These John Doe Defendants are sued in their individual and official capacities as the directors and/or officers of OCA. On all financial matters, these Defendant directors were at all times controlled by and/or acting in cooperation with the SF Companies during the aforementioned time period. This time period is known as the "**Pre-Turnover Period**." After Turnover, on or about late-December 2015 (the "**Post-Turnover Period**"), the SF Companies continue to dominate the OCA and OC Boards (via the TI and BEP directors on the Post-Turnover Period Board) and have continued to engage in fraudulent activities and other misconduct, as more fully set forth below.

### B.  SF Companies' Board Domination and Disregard of Governing Documents

71. Article III, Section 3.2 of the OCA Declaration, sets forth the parameters for "Rule Making Authority" for Oldfield.

72. Section 3.2 provides in relevant part that:

(a)  Subject to the terms of this Article and the Board's duty to exercise business judgment and reasonableness on behalf of the Association and its Members, the Board may modify, cancel, limit, create exceptions to, or expand the Restrictions and Rules.   The Board shall send notice to all Members concerning any proposed action at least five business days prior to the Board meeting at which such action is to be considered.  Members shall have a reasonable opportunity to be heard at a Board meeting prior to such action being taken.

Such action shall become effective, after compliance with subjection (c) below, unless Members representing more than 50% of the total Class "A" votes [i.e. the Residential Unit Owners] in the Association **and** the Class "B" Member, if any, disapprove such action at a meeting [i.e. the Sponsor].

OCA Declaration, Article III, Section 3.2(a) at 8 (emphasis added).

73.  Based upon Section 3.2 of the OCA Declaration, notice to OCA Members is mandated for any modification, cancelation, limit, created exceptions to or expansion of the Restrictions and Rules.  During both the Pre-Turnover Period and Post-Turnover Period, the OCA and OC Boards failed to provide mandated notice as required under Section 3.2, as discussed more fully below.

### C.  Pre-Turnover Fraud, Self-Dealing and Dominance by Defendants

#### i.  *TI Transfer of Assets to BEP*

74. In 2013, TI sold lots, known as the "Cottage" lots (the "**Cottage Lots**"), in Oldfield to BEP and transferred the Declarants rights (but no obligations) under a certain document entitled "Assignment of Rights of Declarant under Recreational Covenant to BEP Oldfield, LLC" (the "**BEP Recreational Assignment Covenant**"), dated October 23, 2013, transferring ONLY the rights, *but no obligations*, under the Declaration of Recreational Covenant for Oldfield Club, November 27, 2000 (the "**OC Recreational Covenant**").

75. In addition, TI transferred lots (the "**Lakeside Lots,**" together with the Cottage Lots, the

"**BEP Lots**") to BEP comprised of lots in an area of Oldfield governed by a separate Declaration of Covenants, entitled Declaration of Covenants, Conditions, and Restrictions for Lakeside Village ("**Lakeside Village**"), dated December 27, 2004 (the "**Lakeside Declarations**"). TI purported to transfer its Declarant rights and obligations under the Lakeside Declarations. In total, the BEP/ TI transaction removed an estimated 20% of the lots from contributing dues to the OC, but the mandated federally filed Property Report (defined below) was never updated to reflect the foregoing.

76. In the "Assignment of Rights of Declarant under Recreational Covenant to BEP Oldfield, LLC," dated October 23, 2013, there is reference to a "purchase agreement" (the "**BEP Purchase Agreement**") governing TI's transfer of assets to BEP, **but the BEP Purchase Agreement has never been recorded or otherwise disclosed to OCA, OC or the Members**:

> [P]ursuant to that certain **Real Estate Sales Agreement dated August 5, 2013 [the "BEP Sales Agreement"]**, between Assignor and Assignee, as successors by assignment from Bald Eagle Partners, LLC (as amended and assigned, the "Purchase Agreement"), Assignor has conveyed to Assignee 108 residential lots located in the community known as Oldfield in Beaufort County, South Carolina;

77. Accordingly, other than, upon information and belief, Price (a former OCA and OCC Director) being shown or told of its contents, *neither the OCA nor OC Boards have knowledge of the terms of the unrecorded BEP Purchase Agreement, nor were they provided with requisite notice of the terms of the BEP Purchase Agreement before the sale of the BEP Lots*, in violation of Section 3.2(a) of the OCA Declaration and other applicable documents and provisions.

78. While dues were paid by BEP pursuant to the OCA' and Lakeside Village's respective Declaration of Covenants, BEP, *who only received an assignment of the rights, but not*

*the obligations* under the OC Recreational Covenant, was, upon information and belief, not required to pay recreational dues ("**Recreational Dues**") for a four-year period after the purchase of the BEP Lots.

79. Social dues are OC dues.  The transfer of the rights, but not the obligations, under the OC Recreational Covenant thus created a dichotomy of rights and obligations under the Recreational Covenant, in violation of *Article I* of the OC Recreational Covenant, which provides:

> Declarant, as owner of Residential Property and the Club Property, hereby declares that all of the Residential Property and Club Property *shall be held, sold, and conveyed subject to the covenants, conditions, and easements contained herein*, *which shall run with the title to all the Residential Property and the Club Property*.  This Covenant shall be binding upon all Persons having any right, title, or interest in any portion of the Residential Property or the Club Property, their heirs, successors, successors-in-title, and assigns and shall inure to the benefit of the owners of each portion of the Residential Property and the Club Property, except as other expressly provided or limited herein.

80. Though the reasons are unclear (particularly because the BEP Sales Agreement has never been recorded or otherwise disclosed to anyone other than Price, as discussed more fully below), TI, as Declarant, has attempted to create a fiction that BEP is a successor-in-interest to Declarant's rights under the OC Recreational Covenant.  By using BEP as a successor-in-interest "shill," TI obtained the benefit of funds paid by BEP for the BEP Lots, $2.75mm, enhancing the BEP Lots' value by unscrupulously allowing BEP to avoid payment of OC dues since the transfer of the BEP Lots in 2013.

81. Regardless of the attempted fiction that BEP is somehow a successor in interest to TI, BEP turns from a purported "Declarant successor-in-interest" to a "Residential Unit Owner" (for all intents and purposes) subject to the burdens the Recreational Dues burden of the OC Recreational Covenant (i.e. Recreational Dues) only as provided in the

"Declaration of Restrictive Covenants," dated October 22, 2013 ("**BEP Restrictive Covenants**"), which provides in relevant part:

>WHEREAS, under that certain Real Estate Sales Agreement, by and between Seller and Buyer, as successor by assignment from BALD EAGLE PARTNERS, LLC, a Maryland limited liability company, dated August 5, 2013 (as modified, amended and assigned, the "Purchase Agreement"), Seller agreed to sell to Buyer and Buyer agreed to purchase from Seller, certain real property which includes the lots described on Exhibit "A" attached hereto and incorporated herein by this reference (the "Lots"; and each individually, a "Lot"); and

>WHEREAS, the Lots are located in that certain community known as Oldfield, but as of the date of these Covenants are not subject to that certain Declaration of Covenants, Conditions and Restrictions for Oldfield dated and recorded November 17, 2000 at Record Book 1354, Page 1359, Beaufort County, South Carolina Register of Deeds (as modified and amended from time to time, the "Declaration"); and

>WHEREAS, the Lots are also not subject to that certain Declaration of Recreational Covenant for Oldfield Club, dated and recorded November 17, 2000 at Record Book 1354, Page 1455, Beaufort County, South Carolina Register of Deeds (as modified and amended from time to time, the "Club Declaration"); and WHEREAS, the Purchase Agreement provides that the Lots shall be subjected to the Declaration and the Club Declaration up (sic) the occurrence of certain future events;

>NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer hereby covenant and agree as follows:

>1. If not earlier submitted to the Declaration by voluntary act of the Buyer, a Lot shall automatically become subject to the Declaration upon the earlier of: (i) October 21, 2017; or (ii) the conveyance of such Lot by Buyer (excluding a mortgage).  Buyer and any future owner of a Lot hereby consent to such automatic submission and any amendment to the Declaration to evidence such submission filed by the "Declarant" under the Declaration.  Upon the submission of any Lot, such Lot shall be held, transferred, sold, devised, assigned, conveyed, given, purchased, leased, occupied, possessed, mortgaged, encumbered and used as a Unit (as defined in the Declaration).

>2. If not earlier submitted to the Club Declaration by voluntary act of the Buyer, a Lot shall automatically become subject to the Club Declaration upon the conveyance of such Lot by Buyer (excluding a mortgage); except that any Lots still owned by Buyer shall automatically become subject to the Club Declaration on the later of (i) the "Turnover Date" under the By-Laws of

26

Oldfield Club (as described in the Club Declaration), or (ii) October 21, 2017. BEP Restrictive Covenants at 1-2.

82. The secret transfer by TI to BEP of rights, but no obligations under the OCA Declaration and OC Declaration, and unilateral "waiver" of BEP's Recreational and Social Dues for a four (4) year period from the time of the 2010 transfer, was in direct violation of the express terms of the OCA ,OC Declaration, and Property Report (defined below) filed with CFPB was undertaken without notice to the OCA ,OC Members and the public, and has caused, and will continue to cause, extreme financial and operational detriment of the OCA and OC and their respective members who have had to carry the costs of OC and OCA's operations via the unilaterally increased dues by the TI dominated and controlled Boards .

83. Furthermore, the SF Companies have attempted to "leverage" TI's "waiver" of dues agreement with BEP in connection with attempting to strong-arm OCA and OC to "settle" any alleged claims deficiencies and other claims, threatening to extend the dues "waiver" period if the OCA and OC fail to withdraw claims against the SF Companies. This threat by the SF Companies is a clear breach of the Declarant's fiduciary duties to the OC and OCA Members and is a continuing pattern of financial frauds perpetrated by the SF Companies. In addition, most recently, Galbraith has told the OC that they are not permitted to sell any additional Golf Memberships than the amount outstanding at turnover.

84. Finally, while the it has been repeatedly represented by TI and the Nominal Defendants that BEP would commence paying dues as of October 2017, no such dues have been paid.

85. As a result of BEP failing to pay dues and TI failing to cover all dues shortfalls, on

January 19, 2018, the new General Manager of Oldfield sent out a "GM First Quarter

Summary" in which it notified Oldfield Members in part:

**Updated Club Budget**

I am writing to inform you that the budget presented and approved by the Club Board at the January 9th meeting has had to be revised and will need board re-approval (though we shall post it on the website). Without question, the Oldfield budget is not straightforward, carrying with it many unique elements that we needed to understand more fully than we initially did, resulting in an error in the earlier draft. There are a number of complex issues---primarily resulting from the TI/Bald Eagle private agreement---affecting our dues structure; thus, in creating the budget, we miscalculated the number of properties expected to pay Club dues. The result of this error was to overstate revenues by $204,474; the corrected Budget will be posted to the web site by Monday, January 22.

This budget was created as a base budget by which the Club could fully operate without any loss of service or quality. We spent a great deal of time on the operational details, cutting where we could without compromising. The point is that, while we made a calculation error, the fundamentals of the budget are solid, but we are not in a flexible position to reduce the budget by $200K without a reduction in service or quality. In order to fund this shortfall, we would forecast an increase in dues by 9% or an annual increase of $484 or monthly increase of $40. The calculations are also based upon the board passing that increase retroactive to include January; therefore, we are asking that the Club Board give the appropriate 45-day notice. If passed, on your April billing, the dues will show the increase and there will be a $120 catch-up charge that equates to the first three months. We *could* increase dues by $54 as of April 1, but feel it more efficient to bill the $40 and add the one-time charge to catch-up. The Board will decide which route it prefers to go.

As was stated in the earlier Board meeting, there would be a special meeting open to all members to go in-depth on the 2018 budget. Accordingly, I have set aside Saturday, January 27th at 2:00 PM for that meeting; I hope there is a good turnout and I look forward to reviewing the budget and answering any questions. Please RSVP so that we may properly arrange the room.
Let me conclude this subject by saying that the staff and I are sorry for this error. The needs would not have changed, but it would have been far more preferable to have been correct the first time, allowing the Board to report to the membership the need for a dues increase at our prior meetings. Still, we now fully understand the complexities of the structure and I assure you that this error will not happen again.

86. Thus, the continued incompetence of the Nominal Defendants via their failure to take any steps to

obtain dues owed by BEP since 2013 or to obtain contractual obligations from TI to make up the

BEP dues shortages, once again, has resulted in an increased financial burden to the Oldfield

Members.

### D. <u>Financial Domination and Improprieties by SF Companies</u>

87. Before turnover, the SF Companies controlled all aspects of OC, including the physical facilities and financial matters.

88. Upon information and belief, the SF Companies with regard to financial matters, directed and controlled the same majority of John Doe Directors who comprised the board or boards directly controlling OCA, and during this time, the SF Companies, BEP (OCA Board seat), and the John Doe Directors had a unified intent with regard to their board actions and votes. The SF Companies, were, and are for all purposes herein, amalgamated corporations in their dealings with the OCA members from 2010 to 2017. The legal distinctions between these corporations are blurred and indistinct. They are and/or were for all intents and purposes identical in their interests, dealings and activities in the administration of OCA. All of these Defendants owed fiduciary duties in their dealings with the members of Nominal Defendant OCA through their directors at all pertinent times, owe such fiduciary duties while they sat on the board as community members.

89. In 2010, the SF Companies, as successor declarants to OCA, together with and acting through BEP (from 2013) and the other John Doe Directors whom they appointed to the board, controlled all of OCA's budgeting, accounting, and general operations. The SF Companies and the John Doe Directors functioned as the successor developers from 2010 through December 2015, when the SF Companies (via TI) effected the premature turnover of the Club Facilities to OC. Under the definitions contained in the Governing Documents of OCA, these Defendants, their successors, directors, officers and community members are "bound parties."

90. TI's premature "turnover" of the OC Club Facilities has placed TI in an even more enviable position than prior to Pre-Turnover. Pre-Turnover, TI failed to properly market Golf Memberships and both TI and BEP undertook no marketing of parcels under their respective ownership for which neither was paying recreational dues. At the same time, TI dominated the OC and OCA Boards and used that control to avoid payment of pre-turnover operating deficiencies and funds owed for capital improvements for which TI refused to expend pre-turnover.

91. After Turnover, TI has no incentive to market the Golf Memberships it holds nor its properties because deficiencies are no longer their problem. It is the prospect of Turnover that compels a Sponsor to market all community assets it holds so it can get out with its investment and no longer be responsible for deficiencies/deficits. Here, TI can sit around and not do a thing with any of the Oldfield assets it owns/controls as it's no longer liable for deficits.

92. In December 2015, TI executed the requisite documents to effectuate "turnover." Per the provisions of the Oldfield Governing Documents, the declarant control turnover process began, and the new member-controlled board of the OCA was elected but was still comprised a TI and BEP Director. Accordingly, while the balance of the OCA and OC Boards were "elected" by Oldfield Members, respectively, the SF Companies still dominated the Oldfield Boards via the TI and BEP directors and the provisions in the Turnover Agreement that provide extraordinary post turnover veto power outlined in the Turnover Agreement.

93. Upon having "elected" board members in the Post-Turnover Period, OCA claims that it only discovered TI's and BEP's misconduct after "turnover." This representation is

patently false.

94. The OCC, described and discussed hereinabove, by the OCC Board's own description, acted as an "oversight" group to assess the financial and operational conduct of the SF Companies, BEP and the OC and OCA Boards.  Price and Barr sat on both the OCC and on the OCA and OC Boards, respectively, and were, upon information and belief, fully apprised of the financial and operational activities of the OCA and OC and took no steps to intervene in the destructive activity by the SF Companies and BEP. Price and Barr even made financial presentations with fictitious financials and the promise to control Golf memberships to influence the communities support of Turnover.

95. In fact, instead of using their directors' positions on both the OCC and the OCA and OC Boards, respectively, to further Oldfield interests, Price and Barr undermined the OCC members' efforts to enjoin what was clearly the improper "turnover" of assets under the OC Transfer Agreement.  Among other actions, OCA Board Members Price and Gerry Healy, both directors of OCC at varying times, crashed a meeting of OCC members being presented with legal advice by Ian Ford, Esq. and engaged in threats and other conduct to intimidate OCC members from approving an injunction action to enjoin turnover.

96. Regardless of serving on the OCC Board and seeking the OCA and OC Members' reasonable reliance on their oversight representations, after defeating attempts by OCC Members to defeat a premature turnover of OC facilities, Price and Barr each landed a director's position on the OCA and OC Boards, respectively, and hired Ian Ford, Esq. (the very same attorney who was retained by OCC to provide legal advice regarding OCA and OC Member rights with respect to a premature turnover) to act as counsel to the OC Board.

97. Furthermore, while by their own admission, both Price and Barr knew of the secret

Purchase Agreement between BEP and TI in which TI "waived" BEP's obligation to pay dues to OCA and OC for at least four (4) years and also knew of the "secret" transaction between Selby and TI to transfer the Greeter's Store to Selby prior to this transaction's consummation. Price also told OCA Members that the OCC legal committee has reviewed the Greeters Store and stated that is was an OC asset and it was subject to the Turnover Agreement. The Turnover Agreement has specific named assets that were to be transferred and the Greeters Store was not listed.

98. Ultimately, the SF Companies, through their OCA and OC board domination consistently failed to comply with the obligations and fiduciary duties of directors as set forth in the Governing Documents. Generally, the breaches of duty revolve around OCA's and OC's budgeting, accounting, finances, and Governing Document compliance.

99. Under the original Governing Documents, there are three separate accounts for the Association: The General Operating Fund, the Capital Reserve Fund, and the Community Enhancement Fund. The SF Companies, the OCA and OC Boards, by and through the John Doe Directors failed in their responsibilities to appropriately manage and fund these accounts as required under the OCA and/or OC in multiple ways, described in detail below. Furthermore, both in the Pre-Turnover Period and Post-Turnover Period, the SF Companies and the OCA and OC Boards, by and through their respective directors, engaged in improper co-mingling of funds and diversion of OC social dues revenues to fund OC golf facilities deficits, which such deficits were to be paid by the Declarant, TI.

### i. _Misappropriation of the Community Enhancement Fund_

100.    One of Derivative-Plaintiff's concerns centers around a segregated monetary fund, created by 8.11 of the OCA and/or OC, which had existed since OCA's inception. This

fund, known as the Community Enhancement Fund (hereinafter referred to as "CEF"), was designed to benefit the members of OCA. This account was originally funded through an initial-sale transfer fee and was designed to be fully separate from the operating and reserve accounts. In fact, the Governing Documents specifically mention that this fund is to have a "segregated" character and is to be used for the sole purposes of community enhancement for the benefit of the members as specified in §8.11(c). The Governing Documents further state the CEF is not to be used to fund any expenditures otherwise contained in the budget for Common Expenses in accordance with §8.3 of the OCA and/or OC.

101.    The strong language creating the CEF in the OCA and/or OC vests in the individual members a property interest and a right to those funds. Originally, all OCA boards were charged with overseeing this CEF and with using it only in a manner consistent with its original purpose and with community interests as specifically outlined in the Governing Documents.

102.    In 2011, without adequate notice to the OCA members, their written approval, or vote of the members as required by common law and the Governing Documents and the John Doe Directors, at the direction of and/or in concert with the SF Companies, voted to "re-purpose" the funding source for the CEF permanently into the Capital Reserve Fund. This unilateral change in the definition of how the CEF was to be used was a blatant breach of the duties owed to the members by the SF Companies and the John Doe Directors and was contrary to §8.11(c). This wrongful, unilateral " re-purposing" of the CEF continued for each year from 2011 through 2015 and still continues after Turnover by the current Board.

103.    Funding the Capital Reserve Fund in accordance with §§8.1 and 8.3 of the OCA and/or OC was an obligation of the OCA. As §8.3 mandates, the annual budget for the OCA includes the contributions to the Capital Reserve Fund in addition to other operating expenses. In the years 2011 through 2014, when Defendants merely funded the budget deficits as permitted in §8.7(b), the SF Companies were required to fund the capital reserve fund, as such funding obligation was included in the calculation of the budget deficits. In 2015, when the Defendants chose to pay the assessments, they effectively joined all other members in sharing the burden of the annual capital contributions; however, the Defendants still would have been required to cover any budget deficits, were there any. There were unfunded deficits in 2015 which amounted to $68,853.

104.    The diversion of monies designated for the CEF into the Capital Reserve Fund unilaterally and wrongfully altered the original purpose for the CEF. The original declarant, in the Governing Documents and in the sales of the lots and homes to OCA members, represented that the CEF was the property of the members. The CEF was to be segregated and used only for specific community purposes. Instead, the CEF was used to reduce the amount of contributions to the Capital Reserve Fund required by the SF Companies and pay for a dog park which is an amenity for the community.  Any amenities before Turnover are to be at the expense of the Sponsor. This misappropriation of transfer fees constituted a wrongful action by the John Doe Directors, at the direction and control of and/or in cooperation and concert with the SF Companies in 2011, and continuing thereafter, wrongfully reducing the SF Companies' capital reserve funding obligations.

105.    These Defendants had projected that the revenue from the CEF from the years 2011 to 2014 would be $386,240.   In fact, the actual revenue collected was approximately

$108,000 less than the projected revenue. Recently, however, the Derivative Plaintiff learned from an in-depth review of the finances that $368,240 was the total amount by which the SF Companies offset their capital reserve account funding duty in years 2011 to 2014. Also in 2015, $112,152 of CEF funds was transferred to the Capital Reserve Fund. All sources used by the Defendants from the CEF inappropriately amounted to $480,392 between 2011 and 2015.

106.    Funding the Capital Reserve Account was a separate component of the budget for Common Expenses, and during the years these Defendants controlled the board, they had the duty to ensure that the Capital Reserve Account was adequately funded. The CEF funding misappropriation by the SF Companies, the John Doe Directors, in 2011 was specifically prohibited by §8.ll(c) of the OCA and/or OC. These Defendants' "re-purposing" of the monies intended for the CEF was a wrongful act, was unauthorized by the Governing Documents, was unauthorized by the owners, was an infringement on a property right owned by the members, and/or was effectively monetary self-dealing in favor of these Defendants, in direct breach of the fiduciary duties they owed to the Nominal Defendants and its members as the sponsor and as directors.

ii.    _Failure to Properly Fund the Capital Reserve Account_

107.    The Governing Documents require capital asset funds to be accumulated for future repairs and replacements of the many community assets, which have a defined longevity. Projected annual reserves are needed for the maintenance, repair, and/or replacement of capital assets such as roads, wooden bridges, sidewalks, fences, docks, guardhouse, storm water systems, et cetera. The Governing Documents set the prudent requirement of budgeting and funding into a reserve account amounts sufficient to meet the projected

needs of capital asset replacement. Sections 8.1 and 8.3 of the OCA Declaration sets forth the specific requirement for this budgeting and funding, which is known as the annual Common Expense Budget.

108.    It is incumbent on all the boards of OCA to carry out this capital reserve function in administering the property. All OCA members rely on such budgeting, and this adequate funding is essential to the health of the community and to property values. Additionally, proper funding is a fiduciary duty owed to members by all boards governing the community. This duty was, at all times during the control period from 2010 through 2015, a function required of the SF Companies and the John Doe Directors leading up to the declarant control turnover at the end of 2015.the SF Companies and the John Doe Directors failed in two ways to properly fund the Capital Reserve Account. First, the amount of money by which they wrongfully offset their obligations with the CEF funds was based on inaccurate and inflated "projected" CEF revenue, not the actual realized CEF revenue. For the years 2011 to 2014 this amounted to a capital reserve shortfall of approximately $163,532.

109.    Second, in addition to the wrongful misappropriation of the CEF, the John Doe Directors also failed to ensure the Capital Reserve Fund itself was adequate and that the projected capital outlay of future expenditures was up to date so that balances would remain sufficient to cover anticipated maintenance, repairs, and replacements of the Common Assets of the community.

110.    The John Doe Directors had based their projected budgets for the capital reserve fund on an outdated reserve study that severely underestimated the actual costs necessary to fully account for the fund's future expenditures. Further, they failed to actually

contribute even the insufficient amount of Capital Reserve Fund contributions prospectively required by their own outdated and inadequate reserve study. The Nominal Defendants, by way of the reserve fund study recently prepared by a nationally-known reserve analysis firm, calculated the total shortfall to the capital reserve fund for the OCA to be approximately $648,454 for the years only between 2011 and 2015.

111.    The SF Companies and the John Doe Directors were negligent in their wrongful actions both in reducing their funding obligations by projected CEF monetary income instead of the actual income and in relying on an erroneous and outdated reserve study that under- calculated the amount of money the SF Companies were required to contribute to properly fund the capital reserve account for the Nominal Defendants.

### iii.    Underfunding the General  Operating Accounts

112.    Under §8.7(b) of the OCA and/or OC, in order to fund the general operating account for the OCA, "Declarants (and the SF Companies as successors) have the option to fund budget deficits" each year or pay the assessments the Defendant controlled OCA board chose to impose.  In effect, the SF Companies had until the end of 2015 to fund the difference between the amount of assessments on units subject to assessment and the amount of actual expenditures, which included providing for adequate capital reserves.

113.    In the last year of their control, 2015, the SF Companies decided to pay the assessments. In all years prior to 2015, they chose to "fund the deficit." The Nominal Defendants recently concluded an analysis of all operating account and reserve account deficits that should have been funded by the SF Companies and the John Doe Directors from 2010 to 2015. Upon information revealed by these analyses, the SF Companies neglected their obligation to "fund the deficit" between the actual expenditures and the

assessments by a significant amount.

114.    The SF Companies and the John Doe Directors committed wrongful acts against the Nominal Defendants and Oldfield Members by virtue of a turnover with significant community account deficits existing in the operating accounts and the capital reserve accounts.

115.    Finally, financials for 2016 just disclosed by discloses steep operating losses (-$650,000) and negative net income (-$498,000) for non-golf facilities.  Because non-equity memberships have been artificially limited by TI, the OC is barely breaking even for annual operational costs and does not have the funds to make millions of dollars in infrastructure maintenance required for Club Facilities.  The OC Members are now paying significantly higher dues, subsidizing golf operations, paying the overhead for the Golf Clubhouse and receiving a lower level of services as they are essentially paying for BEP's OC unpaid dues for the past four years.

*iv. Summary of Funding Obligation Failures*

116.    Upon information obtained by the Nominal Defendants in its review of accounting records turned over by the end of the control period in 2015, the CEF, operating, and reserve accounts for OCA were mismanaged and underfunded by a total of nearly $2.5 million dollars.

117.    The Nominal Defendants' Boards and all OCA members and OC Social Members must now cover these significant shortfalls caused solely by these Defendants' actions, which total nearly $2.5 million. As a direct result of these budgetary deficits, the Nominal Defendants' Boards have recently voted to significantly increase assessments on its members-10% going forward-in an attempt to close the gap in the amount of money

necessary to be contributed annually to the fund the Capital Reserve Fund. The Nominal Defendants have also lost some of the Community Enhancement Fund and all the benefits those funds could have been used for, had they not been misappropriated for the benefit of the SF Companies.

118.    The Nominal Defendant, OCA, lost significant revenue from a prescribed monetary percentage of home sales which would have been added to the Community Enhancement Fund, but were instead transferred to the OCA Reserve Account.  This directly and exclusively benefited TI  by reducing their required contribution to fund the OCA Reserve Account at Turnover.

119.    OC and OCA have made demands and claims on these the SF Companies for the shortfalls described herein. Claims for inadequate reserves and reimbursement have not been satisfactorily addressed by these Defendants as of the filing of this complaint.

120.    Though the OC Governing Documents do not require a reserve account for OC, cuts made to the OC budget caused premature failure of OC assets as required maintenance was and continues to be neglected by the TI controlled boards.

**E.   Turnover by TI to OC**

121.    A  contract  entitled  the  "Agreement for Transfer of Assets"  (the "**Transfer Agreement**"), dated December 8, 2000, exists between  TI  (formerly, Oldfield, LLC) and OC.

122.    The Transfer Agreement was executed by the Sponsor, Oldfield, LLC, and OC. At the time of the execution of the Transfer Agreement, Charles S. Mitchell, as Senior Vice President and Project Manager of Oldfield, LLC (the "**Original Sponsor**") signed for the Sponsor.  Charles S. Mitchell *also executed* the Transfer Agreement as President

of OC.

123.     A review of all amendments to the Transfer Agreement (the "**TA Amendments**") discloses that the same signatory executed the Amendments for OC and "Sponsor" (i.e. TI Oldfield Operations, LLC, by SF Operations, LLC).

124.     Upon the fulfillment of certain express conditions set forth in Article I (Definitions) under the definitions of "Transfer Date" and "Turnover Date," the Transfer Agreement required TI to, among other things, turn over a first-class golf and country club to OC.

125.     The Transfer Date is defined as and takes place upon, *inter alia*, the transfer of "Club Facilities" by TI, which shall occur on or before the Turnover Date, "but not before the sale of at least 250 Golf Memberships unless otherwise approved by at least 65% of the Club's equity members." Transfer Agreement, Article I at 1. The Turnover Date is defined as and takes place, *inter alia*, upon the date the Sponsor's right to control the OC Board pursuant to Section 4.3 terminates, "which shall occur within 180 days after the first to occur of the following:

    i.   The date upon which (A) all Authorized Golf Memberships have *initially* [emphasis added] been sold to persons *other than the Sponsor or affiliates of the Sponsor* [emphasis added], or (B) the Sponsor has sold all home sites planned for the Community, *whichever is later* [emphasis in original]*; or

    ii.   The Sponsor's election at any time following the third anniversary of the later of the Golf Commencement Date or the Social Commencement Date, provided the Club has had a positive cash flow from operations for a minimum of 12 months; or

    iii.   The members' election at any time after the tenth anniversary of the sale of the first Golf Membership, upon the affirmative vote of Community Members (as defined in the Bylaws) entitled to cast at least 51% of the Community Members and the affirmative vote of Equity Golf Memberships (as defined in the Bylaws) entitled to cast at least 51% of the total votes of Equity Golf Members, provided that at least 51% of the Authorized Golf Memberships have been issued and are outstanding at the time of such vote.

126.    In violation of the express provisions of Article I of the OC Declaration, set forth hereinabove, TI turned over the golf and country club to OC in or about December 2015, failing to deliver a "first class" golf course, club and other recreational facilities and failing to satisfy the "initial" sale requirement by TI of 250 Equity Golf Memberships.

127.    To the contrary, TI delivered a golf course and club with a failing infrastructure, few Equity Golf Memberships, and a huge operational and maintenance deficit which TI failed to satisfy pursuant to the express terms of the OC and OCA Declarations.

### F.  The Sale of the Greeters Store

128.    Selby was the managing member of Defendant EGH. At some point in 2016, EGH agreed to purchase from the SF Companies through Defendant Oldfield Holdings, who agreed to sell post-declarant-control turnover, a parcel of real estate known as the Greeters Store. This parcel of land and the Greeters Store building on it have always been integral to the functioning of the Oldfield community as it is at the entrance to the community. It houses security cameras and a post office, and it has served various other community functions for many years. The Greeters Store has long been a symbol of the community; in fact, its image is used on the Oldfield Community's official website. All Defendants knew or should have known the Greeters Store was an HOA asset, was critical to the community structure as it contained all utilities, security, was sustained by the HOA and would not exist but for Oldfield POA pond storm water runoff.

129.    Selby was, at all material times in 2016 until his termination in October 2016, the Chief Operations Officer, Treasurer, and/or general manager of OCA and also held the same positons for the associated entity known as OC. Selby's written contract as general manager and/or Chief Operating Officer was with the Club; however, the contract imposed

41

upon Selby many obligations to perform directly for OCA. Selby had a staff of employees who were compensated by funds from both OCA and Club. The OCA was an understood party to the employment contract, or, in the alternative, a third-party beneficiary of the employment contract at minimum. Selby, who had been the general manager for a number of years of both OCA and OC, knew of the importance of the Greeters Store to the OCA and to the community.

130.    Selby knew of the financial support the OCA members paid to him over all the years he was employed by OC. Selby knew some portion of the OCA assessments went to fund the Greeters Store for its expenses, maintenance and upkeep. Selby knew and appreciated that the OCA's and Club's loss of control of the Greeters Store would have a detrimental effect on the community members. Selby knew the Greeters Store was an asset the OCA and OC boards expected to be turned over to them at the end of declarant control, or, in the alternative, that they would at least have the first right to negotiate the control or purchase of it with the SF Companies.

131.    Selby knew under his written employment contract that he had a duty of loyalty to the Club, to the Nominal Defendants, OC, and to OCA's members. Selby was being highly compensated under the employment contract.  Selby also recognized that part of the compensation he enjoyed came from OCA funds. Selby knew he had a specific and clear obligation in his employment agreement to inform both the OCA and OC boards when he learned of any business opportunities relating to or similar to the OC or OCA's reasonably anticipated business opportunities. Selby's employment contract specifically stated that such business opportunities are deemed to belong to his employers. Also, as general manager, Selby had a common law duty to adequately advise his principal of opportunities

that might benefit the principal, and by natural extension, the OCA and/or OC.

132.     Selby learned of Defendants Tl's plans to cut the Greeters Store out of the part and

parcel turned over to the OCA and/or the OC at the end of the control period and the plans

to sell it separately solely because of his employment position with the Club/OCA, which

necessitated contact over the years with the SF Companies.

133.     Selby knew or should have known that he would be in violation of his employment

contract by acting on information concerning the sale of the Greeters Store for his own

gain. Selby knew or should have known that his clandestine, avaricious actions based on

this inside information were a wrongful act and a breach of his fiduciary and common law

duties. Likewise, the SF Companies and the John Doe Directors knew or should have

known that they also owed duties of acting in good faith to the members of OCA (and

Club) as former sponsors or as former or current directors of those sponsors in winding up

community affairs related to the declarant control turnover.

134.     The SF Companies, John Doe Directors, and Selby knew or should have known

that Selby had agreed in writing to inform the OCA and/or OC if he became aware of a

business opportunity which could benefit the OCA and/or OC.  Selby, EGH knew or

should have known that OCA had fundamental interests in the Greeter's Store and is the

record owner of the Greeter's Store. These actions were a violation of the duties set forth

in the Governing Documents that negations be conducted in "good faith" as per § 14.2(b)

of the OCA and/or OC.

135.      Exhibits A and B to the OC Declaration clearly delineate property which

comprises "Residential Property" owned by the OCA, and "Club Property" owned by the

OC, which such "Club Property" is the only property subject to "turnover" under the

Transfer Agreement.

136.     Moreover, in case there is any confusion as to the which assets are OCA assets, the recitals to the Transfer delineate the "Club Facilities" subject to "turnover" as:

RECITALS

A.  The Sponsor is the developer of a planned community located in Bluffton, South Carolina, known as Oldfield (the "Community"). The Sponsor is the owner of the real property described on Exhibit "A" (the Property"), which is all or a portion of the property that may become part of the Community. The Sponsor intends to construct within the Property an 18-hole golf course designed by Greg Norman; golf practice facilities; a Golf House with men's and ladies' locker rooms, a golf shop and grill; the River House (a dining and banquet facility with a community dock); an Outfitters Center with boats, kayaks, and fishing gear; an Activity Center with a swimming pool, tennis courts, and fitness center; and maintenance and supporting facilities ("Club Facilities").

B.  The Club is a golf and social club organized to acquire, own and operate various recreational and social facilities for the pleasure and recreation of its members;

C.  The Club desires to acquire the Club Facilities from the Sponsor, and the Sponsor desires to convey the Club Facilities to Club, at such time and on such terms and conditions as are specified in this Transfer Agreement.

137.     Not only is the Greeter's Store not an OC asset, it is also not subject to withdrawal by the Declarant pursuant to Article X, Section 10.1 of the OCA Declaration, which provides *inter alia* that Oldfield Property may only be "withdrawn," in conjunction with Declarant's existing right of annexation pursuant to Section 9 of the OCA Declaration, if said property "has not yet been improved with structures from the coverage the coverage of this Declaration."

138.     In 2015 or 2016, the SF Companies, the John Doe Directors, and Selby secretly began discussions regarding Defendant EGH's purchase of the Greeters Store for Selby's private business venture and gain. Selby formed Defendant EGH for the sole purpose of

purchasing the Greeters Store and acted as an officer or director of Defendant EGH. Upon information, the SF Companies and the John Doe Defendants intentionally failed to bring this sale opportunity to the Nominal Defendants' attention.

139.     Defendant EGH, through Selby, knew or should have known that by entering into a confidentiality agreement with the SF Companies concerning the sale of the Greeters Store and by executing a buy-sell agreement to purchase the Greeters Store, they would be directly interfering with the rights of OCA in the Greeter's Store.  Defendants Selby and EGH knew or should have known that the purchase was an asset of OCA and directly benefited OCA and OCA operations. the SF Companies, Selby and EGH knew this transaction was designed with only their respective pecuniary interests in mind, and that by concluding this sale, they would be stealing the Greeter's Store and its parcel from OCA.  Selby told Price (who relayed this information to the then OCA attorney) of the pending transaction (and had Price sign a non-disclosure agreement with respect to this matter) and neither Price or the OCA attorney informed the other Board members or took any action to prevent the sale.

140.     With this full knowledge, Defendants Selby, EGH, and Oldfield Holding conspired with Defendants TI and the John  Doe  Directors to carve  out  this  parcel, sell  it to Defendants Selby and EGH, and thereby illegally converting an OCA asset without OCA's knowledge and approval and for which such transfer OCA received no compensation.

141.     On October 14, 2016, the SF Companies conveyed the Greeter's Store parcel to Defendant Oldfield Holding, a wholly owned entity of the SF Companies. Four days later on October 18, 2016, Defendant Oldfield Holding conveyed the Greeters Store parcel to Defendant EGH for $575,000. The affidavit attached to the deed listed the physical address

of the Grantee, Defendant EGH, as the same address as Selby EGH was formed to purchase this property, has no other assets that we know of and entered into a $400,000.00 mortgage agreement with Oldfield Holdings GA that is rife with Negative Covenants and favorable Default covenants. This was clearly as "straw man" transaction as EGH has no legal rights accrued by a typical buyer of property.

142.    The sale and its accompanying loss of the opportunity to control the Greeters Store have had a detrimental effect on the Nominal Defendants and its members. The conspiratorial sale of the Greeters Store was an act of self-dealing in violation of Selby's employment agreement, his duties under common law, and his duties as general manager and Chief Operations Officer the OCA. The transaction and the negotiations leading up to the sale of the Greeters Store were an interference with the rights of OCA in their administration of the affairs of their members.

143.    As a direct result of the sale of the Greeters Store, the OC and OCA have expended money and time in attempting to address the hiring of new management and relocation of services and enter into a lease agreement with EGH to continue use of the Greeters Store. Additionally, Nominal Defendants, OCA and OC, have lost the opportunity to gain control of the Greeters Store, a parcel of real estate integrally associated with the other facilities of OCA, so much so as to be considered "common property" of the Oldfield Community.

### G. Asset and Annexation Rights Divestment

144.    As a preamble to Article XIV of the OCA and/or OC, the Oldfield original declarant wrote: "The growth and success of Oldfield as a community in which people enjoy living, working and playing requires good faith efforts to resolve disputes amicably, attention to and understanding of relationships within the community and with our

neighbors, and protection of the rights of others who have an interest in the community." Thus, in addition to the common law duty to act in good faith, the parties to this action are under the same duty to act in good faith in resolving disputes by virtue of the Oldfield OCA and/or OC.

145.    Upon information and belief, during the turnover period, the SF Companies have been divesting themselves of assets, such as the Greeter's store, in an attempt to become judgment-proof for turnover issues and resolution of the Derivative Plaintiffs and the Nominal Defendants' claims in the related actions. Legally and equitably, any corporate veil of the Defendants' TI should be pierced for claims and damages incurred in this action, if in fact the corporate Defendants have become judgment-proof during the pendency of this lawsuit by taking steps to sell assets.

### H. Continued Damage from Domination and Control

146.    In addition, today the SF Companies continue to exert significant control over various issues affecting the Nominal Defendants, Oldfield Members, including, *inter alia,* over property at Oldfield and adjacent properties and over declarant rights at Oldfield, such as the right of Annexation found at § 9.1 of the OCA and/or OC. Upon information and belief, the SF Companies may attempt to exercise that control in ways that will irreparably damage the Derivative Plaintiff and Nominal Defendants during the pendency of this lawsuit, and may then use that malfeasance as leverage to urge the Nominal Defendants to settle these complaints unfairly. Such actions would not be consistent with the requirement of putting forth a good faith effort to resolve disputes amicably.

147.    Before turnover, the SF Companies, the OC and OCA Boards, and respective John Doe Directors, each owed a fiduciary duty to OC and its members. That duty included

putting the interests of OC, OCA and its respective members ahead of the interests of the SF Companies, BEP, the OC and OCA Boards, and the John Doe Directors.

148.    Ultimately, "turnover" of the Club Facilities by came encumbered with a series of monetary, operational and structural problems, none of which were ever addressed by SF Companies, nor was remuneration for all deficiencies ever been forthcoming as required under the OCA Declaration and OC Declaration.  Further, the SF Companies have failed to invest in the requisite upkeep and maintenance of Oldfield Common Areas and have also failed to pay all annual deficiencies in the OCA operating budgets.

149.    Those issues include, but are not limited to:

    a. Certain physical conditions of the OC facilities and OCA Common Areas are in need of immediate repair and/or replacement;

    b. At the time of Turnover, all Authorized Golf Memberships (as defined in the Transfer Agreement) had not *initially* been sold to persons other than the Sponsor or affiliates of the Sponsor.  Nor had the Sponsor sold all home sites planned for the community, as required pursuant to Article 1 of the Transfer Agreement;

    c. Nor did the OC or OCA have "positive cash flow from operations for a minimum of 12 months," as TI was, including but not limited to, (a) improperly diverting funds from OCA (i.e. Social Members' Dues) (b) diverting funds from the Club's Capital Fund and Reserve Fund; and (c) improperly concessionized the Social Club by advertising it publicly for use for weddings and other events for profit and unrelated to its rights (and limitations related thereto) to use OC Facilities, set forth in Article IV, Section 4.1(a)(iv) and 4.2;

    d. The use of the Social Club as a concession by TI for its own benefit and profit, has consistently deprived all Members of access to the facility, restaurant and wait staff for which all Members pay dues;

    e. While the Derivative Plaintiff concurs with OC and assert that TI failed to transfer the Greeter's Store to OC pursuant the Transfer Agreement, a review of the Transfer Agreement discloses that OCA is the record owner of the Greeter's Store;

    f. Failure of TI to turn over all of the required property, including the parcel known as the Greeters Store;

    g. A history of TI, Galbreath, Price and John Doe Directors managing the OC and the OCA in a way that best served TI, rather than OC and its members.  For example, for years TI limited the number of certain types of memberships to avoid reaching a number that might trigger turnover, still refuses to market equity golf memberships and other memberships, and has failed to develop the numerous residential parcels that TI still owns, depriving the OCA and OC of Recreational

and Club Dues required to properly maintain the OC and OCA pursuant to the objectives of the OCA and OC Declarations;

h.   The artificial limiting of certain types of memberships caused, among other things, TI to turn over a club with fewer members than contemplated by the original transfer documents. As a result, the OC takes in significantly less annual revenue than contemplated by the Transfer Agreement;

i.   The SF Companies and the SF Companies' John Doe Directors made or authorized numerous pre-turnover payments from OCA and OC funds for alterations, additions, and improvements that should have been paid for by TI;

j.   TI, Price and Galbreath secretly conspired with the then-general manager of OC, Jamie Selby, and EGH to sell the Greeters Store property to the Selby and EGH. TI, Galbreath, Selby, and EGH did this while knowing that OC had made a legal claim that that property should have been turned over to the Club, and while OC was in negotiations with TI regarding that property;

k.   Today, the SF Companies, Selby and EGH claim that EGH owns the Greeters Store;

l.   Selby owns and controls EGH; and

m.   Assessing a $5000.00 against all Equity Club Members to pay for pre-turnover operating deficits and unpaid capital expenditures due from SH in violation of, at a minimum, Section 5.4 of the Transfer Agreement.

150.   Upon information and belief, the SF Companies have been divesting themselves of assets in an attempt to become judgement-proof for turnover issues. For reasons of equity and the principles articulated in South Carolina case law, an injunction should be imposed upon the SF Companies enjoining it from transferring any of its assets.

151.   Based upon the blurred lines between operational and financial activities of the SF Companies, the common officers and directors by and among the SF Companies, and the apparent control the SF Companies assert over BEP, in conjunction with the obvious fraud, collusion and misconduct perpetuated by the SF Companies via their officers and directors, any asserted corporate veil(s) of the SF Companies and BEP should be pierced for claims and damages incurred this Court should pierce any presumed corporate veil protecting the SF Companies' directors and Officers and further conclude that the SF Companies (in concert with BEP) are nothing more than mere alter egos of each other mandating judgments in this action, if entered against TI and/or BEP, then also entering

such judgments against all SF Companies and BEP as mere alter egos acting in furtherance of self-dealing, collusion and fraud.

152.     In addition, today the SF Companies and BEP continue to exert significant control over OC and ACA, including, *inter alia*, over property at Oldfield, declarant rights at Oldfield, and memberships in OC. Upon information and belief, SF Companies are likely to exercise that control in ways that damage OC and OCA Members, to the benefit of the SF Companies and BEP, and to the extreme detriment of OC and OCA Members. OC accordingly requests a preliminary injunction prohibiting Defendants from exercising their control to the detriment of OC while the legal matters in this lawsuit are resolved.

153.     Other misconduct, negligence, fraud and breach of fiduciary duty in the Post-Turnover Period includes, but is not limited to:

   a.  Commingling of OCA/ OC funds;

   b.  Use of OCA funds for Club Facilities, as this term is contemplated under the OC Declaration;

   c.  SF and BEP influence still exerted through their respective Board Members to the detriment of OCA and OC members;

   d.  Allowing Turnover to transpire without demanding deficiency payments from TI/SF;

   e.  Failure by OC/OCA board to enjoin TI/SF from (and breach of FD by TI/SF for) using facilities for non-member events, depriving members of use of facilities and enriching TI/SF alone;

   f.  Failure of OCA and OC Board to seek recovery of BEP payments since 2010 transfer of lots by TI;

g.   Charging social members for Golf Facilities and rounds of golf they do not use;

h.   Negligence on both Boards for not filing *a lis pendens* post turnover on the Greeters Store;

i.   Negligence of the OCA Board for allowing the Greeters Store sale, Rick Price knew of the sale;

j.   Negligence for not reviewing the Jaime Selby employment contract as part of turnover.  The Boards told the community he had a one year contract;

k.   Failure of the Current OC Board to adequately fund reserves for golf and non-golf facilities;

l.   Undertaking *ultra vires* transactions and transactions which constitute a clear and indisputable conflict of interest in violation of S.C. Sections 33-31-830, 831 and 33-31-304.

m.   Failure to market and sell golf memberships, which was one important item used in selling turnover to the members by Price and Barr; and

n.   The OC Board allowed a 2013 amendment to surface at the end of 2016 that was not properly amended.

154.   Regardless of the fact that all OC Memberships (Equity, Golf and Social) run with land by the express terms of the OCA and OC Declaration, the OC has historically, and continues to, disallow termination of Equity Golf Memberships when an OCA resident sells her/her home, basically holding a former Oldfield resident hostage to an Equity Golf Membership that they may no longer avail themselves of as non-Oldfield Residents, but requiring these former Oldfield residents to pay for an Equity Golf Membership in perpetuity.

155.    Upon information and belief, the OC has permitted some Equity Golf Members to resign since, as least, 2009; thus effecting an inconsistent and undemocratic treatment of Equity Golf Members who choose to resign their membership.

156.    Further adding insult to injury, once a resigned Equity Golf Membership is placed on the Resignation List, OC and TI allege that resigned Equity Golf Membership may <u>only</u> be sold from the Resignation List by TI's efforts as Sponsor.

### I. The Domination, Financial Fraud and Mismanagement have Adversely affected the Value of Homes and Facilities in Oldfield

157.    The damage wrought by the misconduct, fraud, negligence and mismanagement by the Defendants has severely impacted the marketability and market value of Oldfield homes, with many Oldfield residents unable to sell homes at a comparable market value or at all, in what is otherwise a strong residential real estate market.

### J. Use of Mail and Wire to Perpetuate Fraud

158.    Upon information and belief, to carry out and perpetuate the fraudulent and illegal activity set forth hereinabove, the SF Companies utilized telephone landlines and cell phones, correspondence through the U.S. Postal system (and Express mail companies) and via email.    Such mail and wire use occurred, at a minimum, when TI's Board representative participated in Board meetings via phone, the use of the mail system to record documents with the County of Beaufort underlying fraudulent activities by SF, and the constant use of email correspondence and telephones to set up and effectuate the fraudulent and illegal activity set forth hereinabove.

### FIRST CAUSE OF ACTION
(Breach of Fiduciary Duty—All Named Defendants and John Doe Directors)

159.     The allegations above and below are incorporated into this cause of action as if set forth fully herein.

160.     As the developer of Oldfield, the SF Companies owed, and owes, a fiduciary duty to OC and OCA.

161.     As a member of the board of directors of OCA and OC, John Doe Directors each owed a fiduciary duty to Oldfield.

162.     Galbreath continues to serve on the board of directors of OC, and continues to owe a fiduciary duty to OC.

163.     All named Defendants and John Doe Directors breached their fiduciary duties to OC and OCA, including by:

   a.  Turning over facilities that were not consistent with a first class golf and country club, and were in need of immediate repair;

   b.  Improperly handling the finances of the Club before turnover;

   c.  Deliberately manipulating the membership levels of Oldfield Club to favor TI and disfavor OC;

   d.  Failing to pay the appropriate subsidies required from TI before turnover;

   e.  Conspiring with and selling the Greeters Store property to Selby and EGH;

   f.  Putting the interests of TI over the interests of OC, to the detriment of OC;

   g.  Transferring assets to BEP and permitting a waiver of dues

164.     As a result of Defendants' breaches of fiduciary duty, OC and OCA has been damaged, including by:

   a.  Turnover of facilities that were not consistent with a first-class golf and country club, and that were in need of immediate repair;

b.   Comingling and conversion of OCA and OC assets;

c.   Turnover of insufficient and improperly handled finances;

d.   Artificially low membership numbers and accompanying revenues;

e.   Payment of amounts that should have been subsidized by the SF Companies;

f.   Conversion of the Greeter's Store;

g.   Necessity of termination of OC's general manager, and the expense of finding, training, and entering into a contract for a new general manager on an expedited basis; and

h.   Failure to allow Members access to books and records of the OC and OCA.

165.    Such pattern of conduct constitutes a predicate act under the Civil RICO statute.

## SECOND CAUSE(S) OF ACTION
### (Negligence and Negligent Misrepresentation—All Defendants)

166.    . The allegations above and below are incorporated into this cause of action as if set forth fully herein.

167.    Defendants each owed duties to OC and OCA, as described above. These duties included, *inter alia*, common law duties to deal fairly with OC, OCA and its members because Defendants were OCA's and OC's sponsors, managers, persons, directors, employees and/or agents upon which the Club and its members relied for proper administration. Those duties prohibited Defendants from acting in a manner which would harm OC. OCA and its members.

168.    Defendants breached those duties to OC and OCA, as described above.  This includes, *inter alia*, Defendants, through their acts and omissions, making numerous false representations to OC and OCA in their dealings with the OC, including but not limited to the management and funding of the OC during the Pre-Turnover Period, secret and illegal

conversion of the Greeters Store. OC, OCA and its members justifiably relied on the inaccurate information provided to them throughout the years by the Defendants in deciding to purchase their homes and memberships in the Oldfield community, and because of those false representations, OCA, OC and its members have been damaged.

169.     As a proximate cause of the breaches, OC, OCA and its members have been damaged, as described above. This includes, as a direct result of Defendants' negligence and negligent misrepresentations, damages to the Nominal Defendants and Oldfield Members in the form of significantly increased additional assessments, investigation costs to determine the nature and extent of the negligence, wrongful actions of the Defendants, loss of the Greeters Store, extensive shortfalls in accounts, and considerable attorneys' fees and costs.

170.     Such pattern of conduct constitutes a predicate act under the Civil RICO statute.

### THIRD CAUSE OF ACTION
### (Breach of Contract—SF Companies)

171.     The allegations above and below are incorporated into this cause of action as if set forth fully herein.

172.     One or more binding contracts existed between the parties, including the Transfer Agreement, the OC Declaration and the OCA Declaration.

173.     The SF Companies breached the contract(s) or failed to perform the contract(s), including, but not limited to, by:

   a.  Turning over facilities that were not consistent with a first-class golf and
       country club, and were in need of immediate repair;

   b.  Improperly handling the finances of the OC and OCA;

   c.  Deliberately manipulating the membership levels of the OC to favor the SF

Companies and disfavor OC;

    d.  Failing to pay the appropriate operating deficiencies and infrastructure costs required from the SF Companies before turnover;

    e.  Conspiring and selling the Greeters Store property to Selby and EGH; and

    f.  Putting the interests of the SF Companies over the interests of Oldfield members, to the detriment of OC, OCA and its members.

174.    As a result of the breach, OC and the OCA and its members have been damaged, as described above.

175.    Such pattern of conduct constitutes a predicate act under the Civil RICO statute.

## FOURTH CAUSE OF ACTION
### (Tortious Interference with Contractual Relations—SF Companies and Galbreath)

176.    The allegations above and below are incorporated into this cause of action as if set forth fully herein.

177.    An employment contract existed between OC and its former general manager, Selby.

178.    The SF Companies were aware of the contract between OC and Selby.

179.    The SF Companies intentionally procured Selby to breach the employment contract by secretly negotiating with Selby and selling the Greeter's Store to Selby and EGH.

180.    The sale of the Greeter's Store to Selby and EGH was an illegal conversion of an OCA Asset.

181.    The SF Companies' principles participated in the secret negotiations and sale while serving as a member of OCA's and OC's board of directors.

182.    The SF Companies used information obtained by Galbreath in confidence as a member of OC's board of directors.

183.    As a result, OC, OCA and its members have been damaged, including by the loss of the Greeter's Store property, termination of its general manager, expenses of hiring and training a new general manager on an expedited basis, and defense of a new lawsuit filed by Selby against OC in the Court of Common Pleas, Beaufort County: *Jamie D. Selby v. OC*, Civil Action 2016-CP-07-2436.

184.    Such pattern of conduct constitutes a predicate act under the Civil RICO statute.

## FIFTH CAUSE OF ACTION
### (Civil Conspiracy and Request for Declaratory Relief and Indemnification—All Defendants)

185.    The allegations above and below are incorporated into this cause of action as if set forth fully herein.

186.    As previously alleged, the SF Companies, Selby and EHG covertly conspired for the purpose of depriving the OCA of the opportunity to gain ownership of the Greeters Store.

187.    As the conspiracy unfolded and after an investigation by the Club, it became clear that the transfer of the Greeters Store was fashioned and designed to illegally convert the Greeter's Store from OCA's ownership.

188.    As the sale of the Greeters Store foreclosed the possibility of a negotiated settlement on the Greeters Store issue and because it occurred solely as a result of the actions of Defendants, and not by reason of any actions of the Club, OC and OCA are entitled to the following declarations by this Court:

    a.  That the Greeters Store, under principles of equity and law, should be considered common property. As such it rightfully belongs to the Club and/or Oldfield Community Association ("Association") and their members;

    b.  That Defendants violated the terms and agreements for a negotiated process to settle all potential claims, one of which was the future control of the Greeters Store, and as a result OC and OCA have been damaged;

    c.  That OC and OCA are entitled to attorneys' fees and costs in that Defendants did not act in good faith in the settlement negotiations and foreclosed the same, prematurely ending any possible agreement;

    d.  That the Greeters Store is a common property of OC and/or the Association based upon the express terms of the Governing Documents, OC Declaration and Transfer Agreement.

189.    In addition, OC and OCA have suffered other special damages in attempting to unwind the wrongful sale of the Greeters Store. Those special damages include attorneys' fees and various costs associated with the unwinding of the store transaction, the costs and potential liability incurred in litigating the purported breach of Selby's employment contract (the "**Selby Litigation**"), the costs of relocating services previously housed in the store, the loss of good will between OC/OCA and its former long-time employee and between OC/OCA and its developer, the costs to recruit and hire a replacement for Selby, and other costs to be proven at trial.

190.    As such, the Derivative Plaintiff seeks an order directing the SF Companies, jointly or severably, indemnifying the Nominal Defendants for any liability and for all costs and fees incurred with respect to the Selby Litigation and other costs set forth above.

191.    Such pattern of conduct constitutes a predicate act under the Civil RICO statute.

## SIXTH CAUSE OF ACTION
**(Quantum Meruit/Specific Performance/Payment of Dues/Rescission—Greeter's Store/BEP Dues/Turnover--All Defendants)**

192.    The allegations above and below are incorporated into this cause of action as if set forth fully herein.

193.    A benefit was conferred upon the SF Companies by OC/OCA, in the form of confidential inside information about the Greeter's Store, the real estate market and history at Oldfield, and future potential sales at Oldfield, as well as access to the Oldfield community.

194.    The SF Companies realized that benefit in the form of sale of, and profit from, the Greeter's Store, based on the information described above.

195.    It would be unjust for Defendants to retain those benefits without paying their value.

196.    Inasmuch as the sale of the Greeter's Store is void as a matter of law, OCA and OC demand rescission of the Greeter's Store sale and return of the Greeter's Store and Parcel to the OCA.

197.    BEP and SF Companies received a benefit via the transfer of the BEP Lots to the disadvantage of the OCA and OC as a result of the BEP waiver of dues.

198.    It would be unjust for BEP and SF Companies to retain those benefits without paying their value including, but not limited to, the payment of all dues owed by BEP (or by the SF Companies due their breach of the OC and OCA Declarations) pursuant to the express terms of the OCA and OC Declarations from BEP's purchase of the BEP Lots. Thus, full payment of all past dues must be remitted by

TI and BPE.

199.     Finally, given the premature Turnover of OC Club Facilities, Derivative Plaintiff

seeks rescission of Turnover to and for the benefit of the OC.

200.     Such pattern of conduct constitutes a predicate act under the Civil RICO statute

### SEVENTH CAUSE OF ACTION
**(Preliminary Injunction and Declaratory Judgment—All Defendants)**

201.     The allegations above and below are incorporated into this cause of action as if

set forth fully herein.

202.     Defendants continue to exert significant control over the OC, including, *inter alia*,

over property at Oldfield, declarant rights at Oldfield, and memberships in OC.

203.     Defendants continue to owe a fiduciary duty to OC, OCA and its members.

204.     Upon information and belief, Defendants may exercise its control in ways that

damage OC and OCA, to the benefit of Defendants.  This includes, but is not limited to,

sale of the declarant rights and annexation of property into Oldfield.

205.     The Derivative Plaintiff accordingly requests a preliminary injunction

prohibiting Defendants from exercising their control over matters at Oldfield to the

detriment of OC and OCA until the legal matters in this lawsuit are resolved.

206.     The Derivative Plaintiff also seeks a declaratory judgment as to the legality of the

scope of Defendants' control vis-à-vis Defendants' fiduciary duties to the Nominal

Defendants and Oldfield Members.

207.     The Derivative Plaintiff further seeks a declaratory judgment that the sale of

the Greeters Store was improper under law and equity, and should be voided or otherwise

rescinded.

208.     Finally, the Derivative Plaintiff seeks an injunction from this Court enjoining the

SF Companies from transferring any real property or non-cash assets (or conditioning such transfer on the establishment of a constructive trust and escrow of all funds underlying any real estate or other non-cash assets proceeds and profits), and enjoining the SF Companies from transferring any cash.

## EIGHTH CAUSE OF ACTION
**(CIVIL RICO CLAIMS-Mail and Wire Fraud- Predicate Acts-18 U.S.C. §§1961-1968)**

209.    The allegations above and below are incorporated into this cause of action as if set forth fully herein.

210.    As set forth in detail hereinabove, the SF Defendants have engaged in a pattern of misconduct, using mail and wire, comprising at least two (2) predicate acts over a continuing period of seven (7) years.

211.    The misconduct has a district threat of continuing activity in the future.

212.    The predicate acts are inherently unlawful and are conducted in an otherwise legitimate business and have become the regular way of operating OCA, OC and the SF Companies.

213.    Such predicate acts include, but are not limited to, the conversion of the Greeter's Store (and underlying parcel) from an OCA asset to an OC asset and then the illegal and improper sale of the Greeter's Store and parcel to Selby and EH solely to enrich the SF Companies; its dominance of the OC and OCA Boards solely to enrich the SF Companies and to the detriment of the OC and OCA members and the Oldfield Community; the imposition by the OC of the $5000.00 Equity Club Member assessment in violation of Section 5.4 of the Turnover Agreement which, upon information and belief, was orchestrated by TI; TI's failure to pay pre-Turnover operating deficits and pay for necessary capital expenditures and interpreting the OC Governing Documents

(all contract of adhesion written by TI (as successor to Crescent) in violation of their express terms and thus creating sham satisfied pre-conditions required for Turnover; and unilaterally waiving BEP's dues for the BEP Lots for at least a four (4) year period and threatening to provide BEP with a continued waiver of dues in the event the OC and OCA did not withdraw monetary demands against the SF Companies and approve Turnover.

214.     As a proximate cause of SF Companies pattern of misconduct, the Nominal Defendants and Oldfield Members have suffered damages as set forth hereinabove.

**NINTH CAUSE OF ACTION**
**(Modification of Unconscionable/Illusory Contracts/Oppressed Shareholders-S.C.Code**
**§33-14-300)**

215.      The allegations above and below are incorporated into this cause of action as if set forth fully herein.

216.     The Governing Documents, OC Declaration and the Transfer Agreement (the "**Contracts**") are contracts of adhesion.

217.     The Contracts are unconscionable and illusory as they are overwhelmingly one-side and vest all control, power and dominance in the Declarant and are contrary to good conscience and public policy.

218.     Because of the Declarant's complete control over the OC and OCA Boards, the Declarant, in this case TI, has engaged in unilateral control of OCA's and OC's finances and disposition of Oldfield property, to the utter detriment of the Oldfield Members, as set forth hereinabove.

219.     Such unilateral control has rendered the OCA and OC non-TI and non-BEP board of directors and members mere fixtures in the Oldfield operational and financial

process and has held them hostage to the deleterious actions by TI and has, thus, rendered the OCA and OC members oppressed shareholders under South Carolina Law.

220.    As the Contracts are contracts of adhesion and patently unconscionable, the Derivative Plaintiff seeks modification of the Contracts by this Court under applicable South Carolina law.

## TENTH CAUSE OF ACTION
### (Ultra Vires Conduct-S.C. 33-31-304-All Director Defendants)

221.    The allegations above and below are incorporated into this cause of action as if set forth fully herein.

222.    The OC, OCA and TI and their respective directors have engaged in a multitude of ultra vires acts, including, but not limited to, creating the 2013 Amendment to the OCA Bylaws without notice and obtaining a vote of the members; the OC authorizing Turnover when TI failed to satisfy the Turnover prerequisites in the Transfer Agreement; TI's manipulation of profits and number of golf memberships sold to compel Turnover; TI's secret deals with BEP, Selby and EH; TI's illegal conversion of OCA's Greeter's Store; OC's improper application of member dues to golf facilities; among other conduct set forth hereinabove.

223.    Such ultra vires conduct violates South Carolina law and has irreparably harmed Oldfield and its members.

224.    Such pattern of conduct constitutes a predicate act under the Civil RICO statute.

## ELEVENTH CAUSE OF ACTION
### (Conflicts of Interest-S.C. 33-31-831-All Defendants)

225.    The allegations above and below are incorporated into this cause of action as if set forth fully herein.

226.     The OC, OCA and TI and their respective directors and Price have engaged in a multitude of ultra vires acts, including, but not limited to, creating the 2013 Amendment to the OCA Bylaws without notice and obtaining a vote of the members; the OC authorizing Turnover when TI failed to satisfy the Turnover prerequisites in the Transfer Agreement; TI's manipulation of profits and number of golf memberships sold to compel Turnover; TI's secret deals with BEP, Selby and EH; TI's illegal conversion of OCA's Greeter's Store; OC's improper application of member dues to golf facilities; among other conduct set forth hereinabove.

227.     Such ultra vires conduct violates South Carolina law and has irreparably harmed Oldfield and its members.

228.     In conjunction with the ultra vires acts, the respective directors of OC, OCA, TI and SF Companies have engaged in acts constituting a conspicuous conflict of interest in violation of South Carolina law.

229.     Such acts include, but are not limited to, failing to commence the actions set forth in the "Intervening Members" Proposed Complaint; failing to make available and produce understandable financials; producing inaccurate financials; failing to disclose accurate information to OC and OCA members upon which to vote; assessing OC Equity Golf Members for Club Facility repairs to be paid by TI; failing to commence breach of fiduciary duty actions against post Turnover OC and OCA directors arising from their willful financial negligence; failure of TI to market Equity Golf Memberships and holding resigned Equity Golf Members hostage to their memberships; declaring that no Non-equity golf memberships may be sold to the benefit of TI; among other actions.

230.     The above conduct and actions has resulted in self-dealing and enrichment of the

SF Companies and certain OC and OCA Directors and has irreparably harmed Oldfield

and its members.

231.     Such pattern of conduct constitutes a predicate act under the Civil RICO statute.

## TWELFTH CAUSE OF ACTION
### (Improper and Undisclosed Amendment of By-laws-S.C. Section 33-31-1021-All Director Defendants)

232.     The allegations above and below are incorporated into this cause of action as if

set forth fully herein.

233.     The OC directors surreptitiously passed a 2013 amendment to the OC Bylaws

without notice to or undertaking a vote of OC members.

234.     Upon information and belief, this 2013 Amendment was not disclosed to

members until 2016 as a basis upon which the OC Directors could improperly,

retroactively and prospectively, justify applying OC Member dues to care, upkeep and

maintenance of Club Facilities.

235.     Such pattern of conduct constitutes a predicate act under the Civil RICO statute.

## THIRTEENTH CAUSE OF ACTION
### (Failure to properly maintain and produce records for inspection-S.C. Sections 33-31-1601, 33-31-1602, 33-31-1605 and 33-31-1620-All Defendants)

236.     The allegations above and below are incorporated into this cause of action as if

set forth fully herein.

237.     The OC and OCA Boards have and had a duty to properly maintain books and

records and produce them for inspection to members and to member's attorneys.

238.     The OC and OCA Boards have failed to property maintain books and records by

failing to maintain accurate financials, correct inaccurate financials, disclose the

purported 2013 Amendment to the OC Bylaws, render understandable financials that can

be interpreted and read by members, produce for inspection accurate financials, among

other acts.

239.     Such pattern of conduct constitutes a predicate act under the Civil RICO statute.

### FOURTEENTH CAUSE OF ACTION
### (Failure to report OC and OCA commenced Actions to the South Carolina Attorney General-S.C. Sections 33-31-170 and 33-31-171-All Defendants)

240.     The allegations above and below are incorporated into this cause of action as if set forth fully herein.

241.     South Carolina law *mandates the upon any action* filed implicating wrong-doing by directors of planned communities, alleged financial improprieties by planned community boards and other conduct alleged in the actions filed by OC and OCA pending in federal court, the planned community boards must notify the South Carolina Attorney General of the filing of such litigation.

242.     Upon information and belief, the OC, OCA and TI have failed to notify the Attorney General, in writing, of the filing and pendency of the related OC and OCA federal actions.[2]

### FIFFTHTEENTH CAUSE OF ACTION
### (Appointment of Receiver- S.C. Code 15-65-10)

243.     The allegations above and below are incorporated into this cause of action as if set forth fully herein.

244.     Because of the nature of the financial misconduct asserted by the Plaintiff, and the prospect of such continuing misconduct based upon the facts asserted hereinabove,

---

[2] The Plaintiff herein has sent a written notification of the filing of this Complaint, with a copy of the Complaint, to the Attorney General of South Carolina in compliance with S.C. Sections 33-31-170 and 33-31-171.

the Plaintiff request that this Court appoint a Receiver to engage in oversight of BEP's

and the SF Companies' financial dealings and engage in oversight of the OC and OCA

Board of Directors to ensure an accurate accounting, no deprivation or improper

transfers of assets and obtain an unbiased and credible report of the Oldfield operations

and conduct of the Defendants herein.

## SIXTEENTH CAUSE OF ACTION
**(Violation of U.S. TITLE XIV, Section 1401, *et.seq.* (15 U.S.C. 1701 *et seq.*) Deceptive and Inaccurate Property Report-As to TI and the SF Company Defendants)**

245.     The allegations above and below are incorporated into this cause of action as if

set forth fully herein.

246.     Title XIV, Section 1401, *et.seq*., mandates the filing of a property report on

Interstate Land Sales, such as Oldfield.

247.     In 2013, TI filed a property report (the "**Property Report**") representing, among

other things that: (a) The golf club and facilities (i.e. the OC Club Facilities) are *separate*

from the OCA; OCA and OC social members will not be assessed charges or fees for the

Club Facilities; (b) Transfer of the Club Facilities under the Transfer Agreement may

only occur upon before at least 250 Golf Memberships have been sold, but shall

complete the transfer within 180 days after the earlier of the following: the initial sale of

all Authorized Golf Memberships, 375 or the sale of all the lots, whichever occurs last,

or after three years the Developer can elect to transfer  provided the Club has positive

cash flow from operations for a minimum of 12 months or the members elect after the

tenth anniversary of the sale of the first Golf Membership, upon affirmative vote of

Equity Golf Members entitled to cast 51% of the total votes of the Equity Golf Members,

provided that at least 51% of the Authorized Golf Memberships have been issues and are

outstanding at the time of the vote, 51% of all authorized Golf Memberships are 191

Memberships, Transfer can be approved by at least 65% of the Club's equity members,

An affirmative vote of Community Members entitled to cast at least 51% of the total

votes.

248.     TI either made willful misrepresentations in the Property Report or has violated

the express terms of the Property Report and failed to file an amended Property Report to

reflect the inaccuracies in the Property Report.

249.     TI violated Title XIV, Section 1404, by using interstate transportation,

communication or the mails to, among other things: (a) to employ any device, scheme, or

artifice to defraud; (b) to obtain money or property by means of any untrue statement of

a material fact, or any omission to state a material fact necessary in order to make the

statements made (in light of the circumstances in which they were made and within the

context of the overall offer and sale or lease) not misleading, with respect to any

information pertinent to the lot or subdivision; (c) to engage in any transaction, practice,

or course of business which operates or would operate as a fraud or deceit upon a

purchaser; or (d) to represent that roads, sewers, water, gas, or electric service, or

recreational amenities will be provided or completed by the developer without

stipulating in the contract of sale or lease that such services or amenities will be provided

or completed.

250.     TI, violated the Interstate Land Sales Act is liable for civil damages and criminal

penalties set forth in Title XIV, Section 1401, *et.seq.*[3]

---

[3] Pursuant to Title XIV, Section 1401, *et.seq.,* the Derivative Plaintiff is concurrently, with the
filing of this Complaint, notifying the S.C. Secretary of State of the above alleged violation.

251.    Such pattern of conduct constitutes a predicate act under the Civil RICO statute

## SEVENTEENTH CAUSE OF ACTION
### (Theft of Services-As to the SF Companies)

252.    The allegations above and below are incorporated into this cause of action as if set forth fully herein.

253.    SF Companies, in utilizing Club and Recreational facilities for their own benefit and remuneration, and utilizing employees of the OC and OCA to service SF Companies' use of Club and Recreational Facilities to SF Companies' sole and exclusive benefit, has improperly and illegally utilized OC and OCA employees without remitting any compensation to the OC and OCA.

254.    Upon information and belief, the revenue generated by TI related to its "outside wedding and golf business" was used was used by TI to "break even" with respect to OC operational funds. However, upon information and belief, such "outside" revenue was not permitted to be used as revenue during the developer control pre-Turnover period. The venues used by TI for its outside wedding and golf business are for OC and OCA members and their guests. Upon information and belief, the revenue obtained by TI from its outside business using OC and OCA facilities and employees is, to date, approximately $500.000.00. Accordingly, If TI did not have this outside revenue (from OC and OCA facilities and employees and causing wear and tear to the facilities) TI's contribution to fund the deficit have been at least $2,000,000.00.

255.    Accordingly, the outside revenue obtained on the backs and costs of OC and OCA Members amounts to "robbing from Peter to pay…. Peter".

256.    Derivative Plaintiff demands that OC and OCA be compensated for the value of services provided by OC and OCA Employees.

257.        Such pattern of conduct constitutes a predicate act under the Civil RICO statute.

WHEREFORE, Plaintiff request that an order or judgment, as appropriate, be entered against each Defendant on all causes of action, and that Derivative Plaintiff, for the benefit of the Nominal Defendants and Oldfield Members thereof, be awarded:

A.  Actual damages;

B.  Consequential damages;

C.  Special damages arising from: consequential ramifications on the market value of homes in the Oldfield Community; the loss on homes sold by members because of the diminution of market value or the inability to sell homes at all; the OC's Boards enforcement of now voided provisions of the OC Declaration and the Transfer Agreement disallowing Equity Golf Members who sell their homes and/or resign their Equity Golf memberships from ever ceasing payment for Equity Golf dues, fees and assessments, per the S.C. Court of Appeals decision in *Callawassie Island Members Club, Inc. v. Dennis*, 417 S.C. 610, 790 S.E.2d 435 (2016); the OCA and OC's misuse and application of paid dues by respective members; the increased financial burden on Oldfield members via the OC and OCA Boards efforts to impose increased dues, fees and assessments arising from TI's failure to abide by and pay pre-turnover financial obligations, TI's failure to attempt to market, and thus holding hostage, unsold Equity Golf Members, and TI's unilateral waiver of BEP dues on the BEP Lots, among other financially deleterious conduct;

D. Rescission of the sale of and Specific Performance via the return of the Greeter's Store and indemnification by the SF Companies of liability and costs in the Selby Litigation;

E.  Compensatory and treble damages arising under the Federal Civil Rico Act, 18 U.S.C. §§ 1961-1968;

F. That the Court equitably modify the unconscionable/illusory agreements governing Oldfield LLC operations;

G. That an injunction be imposed enjoining any and all of the SF Companies and BEP from transferring any assets during the pendency of this Action and that any and all of the SF Companies and BEP be compelled to preserve all assets;

H.  That a Receiver be appointed pursuant to South Carolina Code of Laws, Title 15, Chapter 65, Section 15-65-10(1);

I.  Punitive damages;

J.  A preliminary injunction as set forth above;

K.  A declaratory judgment as set forth above;

L.  A full accounting of pre-turnover and post-turnover finances, including allocations, expenditures, payments, and transfers by and among Defendants;

M.  Equitable relief as requested above, including piercing of the corporate veil(s) of defendants;

N.  A constructive trust, to the extent permitted by law;

O.  Civil penalties and damages under Title XIV, Section 1401, *et.seq*.;

P.  Criminal penalties under Title XIV, Section 1401, *et.seq*.;

Q.  Rescission of Turnover;

R.  Reimbursement of costs associated with TI's use of OCA and OC employees in connection with non-OC and non-OCA activities;

S.  Pre-judgment and post-judgment interest;

T.  Attorneys' fees, expenses and costs; and

U.  Such other and further relief as the Court and jury deem just and appropriate.

Plaintiff demand a trial by jury and reserve all rights to amend this Complaint.


Date:   January 25, 2018
        BEAUFORT, S.C.

                              s/ Denise L. Savage
                              Denise L, Savage, Esq.
                              South Carolina Bar No. 102567
                              Savage Law, PLLC, Attorneys for the Plaintiff
                              500 Carteret Street
                              Beaufort, South Carolina 29902
                              Phone: (843) 522-0058
                              Fax: (843) 522-2152
                              Email: dsavage@savagelitigation.com


**Verification of Rob Star on Following Page**

## **VERIFICATION OF ROB STAR**

1.  I, Rob Star, am the Derivative Plaintiff in the above captioned action and a citizen of the United States of America.

2.  I have personal knowledge of all allegations set out in the foregoing Verified Amended Complaint and if called on to testify, I would competently testify as to the matters stated herein.

3.  I verify under penalty of perjury under the laws of the United States of America and the State of South Carolina that the factual statements in the foregoing Amended Complaint are true and correct.

Executed on this 25ᵗʰ day of January 2018

_____

Rob Star

72