*Denise L, Savage, Esq.* (S.C. Bar No. 102567)
dsavage@savagelitigation.com
**Savage Law, PLLC,** *Attorneys for Plaintiff Rob Star, derivatively and on behalf of Oldfield Community Association, LLC and Oldfield Club, LLC as Nominal Defendants*
500 Carteret Street
Beaufort, South Carolina 29902
Phone: (843) 522-0058
Fax: (843) 522-2152

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**(BEAUFORT DIVISION)**

| | |
|---|---|
| ROB STAR, DERIVATIVELY AND ON BEHALF OF ALL NOMIMAL DEFENDANTS, OLDFIELD COMMUNITY ASSOCIATION, LLC AND OLDFIELD CLUB, LLC, AND ON BEHALF AND FOR OLDFIELD COMMUNITY ASSOCIATION, LLC'S AND OLDFIELD CLUB, LLC'S RESPECTIVE MEMBERS,<br><br>                  Plaintiff,<br><br>    v.<br><br>TI OLDFIELD DEVELOPMENT, LLC, AND TI OLDFIELD OPERATIONS, LLC, BY AND THROUGH THEIR RESPECTIVE BOARD OF DIRECTORS, JOHN DOES 1-10, INDIVIDUALLY AND AS DIRECTORS BETWEEN THE TIME PERIODS 2010-2017 including PHILLIP GALBREATH and I. WILLIAM STOLZ, III; OLDFIELD HOLDINGS GA, LLC; SF CAPITAL, LLC; SF OPERATIONS LLC; JAMIE D. SELBY, INDIVIDUALLY AND AS MANAGING MEMBER OF ELLIOT GROUP HOLDINGS, LLC; ELLIOT GROUP HOLDINGS, LLC; OLDFIELD COMMUNITY COUNCIL (2013-2015), including JAY BARR and RICHARD PRICE, BY AND THROUGH ITS RESPECTIVE BOARD OF DIRECTORS, JOHN DOES 11-20; OLDFIELD CLUB (2010-2017), BY AND THROUGH ITS RESPECTIVE BOARD OF DIRECTORS, JOHN DOES 21-30, including JAY BARR, PHILLIP GALBREATH and I. WILLIAM STOLZ, III; AND OLDFIELD COMMUNITY ASSOCIATION (2010-2017), BY AND THROUGH ITS RESPECTIVE BOARD OF DIRECTORS, JOHN DOES 31-40 including RICHARD PRICE, PHILLIP GALBREATH and I. WILLIAM STOLZ III; BALD EAGLE PARTNERS, LLC and BEP OLDFIELD, LLC, BY AND THROUGH THEIR RESPECTIVE BOARD OF DIRECTORS (JOHN DOES 41-50)<br>                  Defendants,<br><br>   -and-<br><br>OLDFIELD COMMUNITY ASSOCIATION, LLC AND OLDFIELD CLUB, LLC,<br><br>                Nominal Defendants. | **CIVIL ACTION NO: 9:17CV2489(DCN)**<br>    (DERIVATIVE ACTION)<br><br>*(RELATED ACTIONS)*<br>(CIVIL ACTION NO.: 9:17-CV-452-DCN)<br>(CIVIL ACTION NO.: 9:17-CV-794-DCN)<br>   (Jury Trial Demanded)<br><br>**HEARING REQUESTED**<br><br>***(I)***   ***ROB STAR, DERIVATIVE PLAINTIFF'S OBJECTION AND SUPPORTING MEMORANDUM OF LAW, FILED PURSUANT TO FRCP 53, TO REPORTS AND RECOMMENDATIONS OF SPECIAL MASTER KATHLEEN C. BARNES:***<br><br>***(a) Dismissing the Amended Derivative Complaint filed in this Action (ECF Doc. #96)***<br>***(b) Denying Derivative Plaintiff's Motion to Amend the Amended Complaint (ECF Doc.#97)*** |

ROB STAR (the "**Derivative Plaintiff**")[1], derivatively and on behalf of all nominal defendants, Oldfield Community Association, LLC (the "**OCA**") and Oldfield Club, LLC (the "**OC,**" together with OCA, the "**Nominal Defendant(s)**") and the Nominal Defendants' members (collectively, the "**Members**"), hereby files Derivative Plaintiff's objection, pursuant to Federal Rules of Civil Procedure ("**FRCP**") 53, to the Reports and Recommendations of Special Master, Kathleen C. Barnes (the "**Special Master**") (a) Dismissing ("**Dismissal Recommendation**" (ECF Doc No. 96)), *inter alia,* the Derivative Plaintiff's Amended Complaint (the "**Amended Complaint**," ECF Doc No 52, with exhibits[2]) and (b) Denying the Derivative Plaintiff's Motion to Amend the Amended Complaint (ECF Doc. No. 97) ("**Amendment Recommendation**" together with the Dismissal Recommendation, the "**Recommendations**"), and respectfully sets forth and represents as follows:

### Jurisdiction and Standard of Review

This Court has jurisdiction to review, and adopt or affirm, the Dismissal Recommendation and Amendment Recommendation pursuant to FRCP 53(f)(1).

This Court must decide, *de novo*, all objections to findings of fact and conclusions of law made or recommended by the Special Master pursuant to FRCP 53(f)(3) and (4).[3]

### Findings of Fact and Conclusions of Law upon which the Special Master Erred

---

[2] All capitalized terms herein shall have the meanings ascribed in the Amended Complaint, unless otherwise defined herein.

[3] With respect to this Objection to the Recommendations, the Derivative Plaintiff seeks a hearing before this Court pursuant FRCP 53(f)(1) provides in relevant part:

> (f) Action on the Master's Order, Report, or Recommendations.
>> (1) *Opportunity for a Hearing; Action in General.* In acting on a master's order, report, or recommendations, the court must give the parties notice and an opportunity to be heard; may receive evidence; and may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions.

I. Did the Special Master err as a matter of fact and law, in finding that the Derivative Plaintiff failed to make demands of the Oldfield Club (the "**OC**") Board of Directors ("**OCBOD**"), pursuant to SCRCP 23(b)?

II. Did the Special Master err as a matter of fact and law, in finding that the demands made by other Community and Social Members of Oldfield may not be utilized by Derivative Plaintiff to satisfy the demand requirement under SCRCP 23(b)?

III. Did the Special Master err as a matter of fact and law, in finding any such demand by the Derivative Plaintiff on the OCBOD was or would have been, in any event, futile?

IV. Did the Special Master err as a matter of fact and law, in finding that the "Business Judgment Rule" applied to *ultra vires* acts by the OCBOD and Oldfield Community Association (the "**OCA**") Board of Directors ("**OCABOD**") alleged by the Derivative Plaintiff?

V. Did the Special Master err, as a matter of fact and law, that TI Oldfield, LLC and TI Development, LLC (collectively, "**TI**") in concluding that TI, BEP and the Equity Golf Members did not continue to control the OCBOD after turnover of OC assets to the OC and OCA assets to OCA in 2016 ("**Turnover**"[4])?

---

[4] While the Derivative Plaintiff alleged in the Amended Complaint and at the Hearing that TI retained "superveto" power under the Agreement for Transfer of Assets by and between Oldfield, LLC and Oldfield Club (the "**Transfer Agreement**") annexed hereto and made a part hereof as **Exhibit 1)**, this allegation was denied by the Defendants. However, a review of the Transfer Agreement discloses the following terms:

VI.   Did the Special Master err as a matter of fact and law in concluding that claims in the Amended Complaint that are duplicative of claims in the OC and OCA sister actions, need not have been included in the Amended Complaint to support a RICO claim asserted in the Amended Complaint?

VII.  Did the Special Master err as a matter of fact and law in failing to acknowledge that because the Derivative Plaintiff only represents OC and OCA members who are similarly situated, pursuant to FRCP 23.1 (i.e. the Derivative Plaintiff does *not* represent the Equity or non-Equity Golf Members, as he is not a Golf Member), the majority control of the OCBOD by the Golf Members, TI and BEP, rendered all demands by the Derivative Plaintiff futile?

---

**4.3.   Restrictions on Club.**

So long as the Sponsor owns any property in the Community for development or sale, the Club shall not, without the prior written consent of the Sponsor, which consent Sponsor may withhold in its sole and absolute discretion:

(a)    amend the Club's Articles of Incorporation, Bylaws, the Club Rules, or the Membership Materials referenced in Section 6.1(b) and used in connection with the offering and sale of memberships in the Club, in any manner which is inconsistent with the rights reserved to the Sponsor under this Agreement;

(b)    sell, transfer, or pledge the Club Facilities; or

(c)    take any other action which in the Sponsor's sole and absolute opinion adversely affects the Club's ability to sell memberships or the Sponsor's ability to sell property in the Community.

Because TI, as the Sponsor, continues to "own property" in the Community for development or sale, it is clear that the import of this broadly and ambiguously drafted Section 4.3 of the Transfer Agreement provides TI with the "sole and absolute" power to veto any action by the OC Board that it deems "adverse" to its interests in the Oldfield Community.

Derivative Plaintiff also reminds this Court that on a motion to dismiss under FRCP 12, all allegations alleged by the Derivative Plaintiff must be taken as true. When considering a motion for judgment on the pleadings, the court accepts **as true all well-pleaded allegations** and views the complaint in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)

*Brockman v. Am. Suzuki Motor Corp.*, No. 6:11-3381-TMC, 2012 U.S. Dist. LEXIS 112424, at *7 (D.S.C. Aug. 10, 2012)

VIII.  Did the Special Master err as a matter of fact and law in concluding that amending the Amended Complaint would be futile?

## THE SPECIAL MASTER'S RECOMMENDATIONS

A.  After a hearing held before the Special Master on July 6, 2018 (the "**Hearing,**" a transcript of which (the "**Transcript,**") is annexed hereto and made a part hereof as **Exhibit 2**), on July 24, 2018, the Special Master entered the Dismissal Recommendation and Amendment Recommendation, concluding, *inter alia*, respectively, that the Derivative Plaintiff (a) failed to demonstrate adequate demands or futility in making such demands, pursuant to Federal Rule of Civil Procedure 23.1, were made by Plaintiff to the OC and OCA boards or that the OC and OCA have failed to exert appropriate business judgment in declining to pursue certain claims set forth in the Derivative Plaintiff's Amended Complaint (ECF Doc. No. 52), and (b) failed to demonstrate that amending the Amended Complaint would not be futile.

B.  Preliminarily, the Special Master identified a series of claims in the Derivative Plaintiff's Amended Complaint that are not being asserted in the OC and OCA actions (Case Nos. 9:17cv0452 and 9:17cv0794).  Such claims asserted by the Derivative Plaintiff, and not asserted by OC and OCA, as identified by the Special Master include:

i.  First Cause of Action: Breach of Fiduciary Duty against all Defendants arising from the transfer of assets to BEP and permitting a waiver of social dues paid to OC (paragraph 163(g));

ii.  Fifth Cause of Action: Civil Conspiracy, Declaratory Relief and Indemnification against BEP seeking indemnification from TI for potential liability arising out of the OC termination of the Jaime Selby general manager contract;

      iii.  Sixth Cause of Action seeking rescission of Turnover and quantum meruit for dues BEP did not pay on its lots;

      iv.  Eighth through Seventeenth Causes of Action which are not asserted in the OC or OCA actions (i.e Civil RICO Claims, Predicate Acts-18 U.S.C. §§1961-1968); Mail and Wire Fraud; Modification of Illusory/Unconscionable contracts and oppressed Shareholders; Ultra Vires conduct; Conflicts of Interest (SCC Section33-31-831)[5]; Improper and Undisclosed Amendment to By-laws (SC Section 33-31-1021); Failure to properly maintain and product records for inspection (SC Sections 33-31-1601, 33-31-1602, 33-31-1605, 33-31-1620); Failure to Report Commencement of Action to SC Attorney General (33-31-170-171); Appointment of a Receiver (S.C. Code Section 15-65-10); Filing of Deceptive and Inaccurate Property Report (15 U.S.C. § 1701, et.seq.); Theft of Services.

(the "**Surviving Claims**").

C.    The Special Master failed to acknowledge two other claims by the Derivative Plaintiff in which the Derivative Plaintiff asserts (a) various claims of *ultra vires* conduct by both the *pre-turnover* and *post-turnover* OCABOD and OCBOD (b) and the claim (arising from ultra vires actions) that non-golf members' fees are being used to support golf facilities in violation of the Governing Documents. (the "**Unacknowledged Claims**," together with the Surviving Claims, the "**Unasserted Claims**").

---

[5] SC Code Section 33-31-831, entitled "Director Conflict of Interest," states:

    (a)  A conflict of interest transaction is a transaction with the corporation in which a director of the corporation has a direct or indirect interest.

Here, the Derivative Plaintiff has alleged with particularity in the Amended Complaint that TI and BEP

D.    Regardless of finding that the Unasserted Claims are not being pursued by OC or OCA, the Special Master ultimately recommended that the Amended Complaint be dismissed based upon her finding that (a) the Derivative Plaintiff failed to make "demands" for the commencement of litigation relating to the Unasserted Claims, and (2) and failed to prove the futility of making such demands.

E.    Finally, the Special Master concluded that amending the Amended Complaint would be futile.

## APPLICABLE FACTS

1. Oldfield Community is a gated, planned community comprised and operated by two (2) separate entities: the OCA and the OC.

2. The OCA, a not-for-profit limited liability corporation, collects mandatory homeowners' association dues on a monthly basis from members (i.e. homeowners) (the "**Residential Dues**").  A portion of the HOA Dues are transferred to the OC to assist in maintaining non-golf related facilities operated by the OC (the "**Social Facilities**").

3. The OC, a not-for-profit limited liability corporation, operates two (2) separate functions. The first function is to collect mandatory social dues (the "**Community Dues**") from all members of the Oldfield Community. The Community Dues are to be applied *only* to maintain Non-Club Facilities which, include the River House (restaurant), an Outfitters Center with boats, kayaks, and fishing gear and an Activity Center with a swimming pool, tennis court, and fitness center.

4. The OC Declaration declares the following:

> By this Covenant, Declarant desires to provide for issuance of a Community Membership [] in the Club for each home or homesite within the Residential Property ("Residential Unit") and *to establish the obligation of the owner(s) of*

*each Residential Unit to pay such periodic dues for Community Membership as the Club may establish from time to time in accordance with this Covenant.*

5. OC Declaration at 2 (emphasis added).  Thus, the OC Declaration **only** governs payment of Community Dues paid by residents, **and does not relate to Golf Club membership, other than to declare that "the Community Members <u>shall not</u> be subject to assessment for operating deficiencies or capital improvements related to golf facilities or golf operations.**"

6. The OC Declaration further declares that the Community Membership entitles each of the residential owners in Oldfield to:

   *a.* Use of food and beverage facilities as the Club Operator may designate and the community dock, if any, operated by Club Operator on the Club Property;
   *b.* Use the boats, kayaks, and fishing gear provided at the Outfitters Center, if any, operated by Club Operator on the Club Property;
   *c.* Use the swimming pool, tennis courts and fitness center comprising the Activity Center, if any, operated by Club Operator on the Club Property;
   *d.* Participate in such social activities as the Club Operator may sponsor from time to time for holders of Community Memberships ("Community Memberships"); and
   *e.* Such additional privileges, if any, as the Club Operator may specify.

OC Declaration at Article II.  OC Bylaws, Article II (annexed hereto and made a part hereof as **Exhibit 3**).

7. Annexed to the Second Star Affidavit (annexed hereto as **Exhibit 4**) is a true and correct copy of the "First Amendment to the Declaration of Recreational Covenant for Oldfield Club." (the "**Declaration Amendment,**" The purpose of the Declaration Amendment was "for the purpose of creating two dues categories for Community Members, one category for Residents and one category for non-residents…" Declaration Amendment at 1.

8. Amended Section 3.1 of the Declaration Amendment (cited, in part, in the Lower Court Order), entitled "Covenant to Pay," provides in relevant part:

   Each Owner, by accepting title to a Residential Unit, covenants and agrees to pay to the Club Operator assessments, annual dues, and minimum usage fees in such amount as Club Operator shall specify from time to time, *except that Community*

> *Members shall not be subject to assessment for operating deficits or capital improvements related to golf facilities or golf operations.*

Declaration Amendment, Section 3.1.

9. Pursuant to the Declaration Amendment, the Community Dues are to be applied **not** to be applied to operating deficits or capital improvements related to golf facilities or golf operations, but only to "a reasonable share of the overhead expenses associated with general operation and administration of the Club, including:

   *a.* the costs of utility service (including water, sewer, electricity, natural gas, and cable or similar television) provided to facilities;

   *b.* the costs of janitorial service, maintenance and repair; property and liability insurance; and similar ongoing expenditures related to such facilities; and

   *c.* the costs of maintaining, repairing and replacing the buildings, fixtures, furnishings, equipment and systems located within or that serve such facilities, which may include a reasonable contribution to a reserve fund for repair and replacement of such items;

   *d.* That portion of the costs that Club Operator incurs in sponsoring activities in which the Community members are invited to participate; and

   *e.* administrative and overhead costs related to such facilities, services and programs or membership administration generally, including labor and payroll expenses.

Second Affidavit of Rob Star, Exhibit 1, Declaration Amendment at 3, Section 3.1.

10. The OC has an additional membership class entitled "Equity Golf Membership." *See* OC Bylaws, Article II. An Equity Golf Membership encompasses the following rights and privileges:

> Equity Golf Membership entitles the Member or its Designee and other Authorized Users of the Membership to use all of the Golf Facilities and all of the Social Facilities during operating hours and subject to the Club Rules. After the Turnover Date, Equity Golf Members shall be entitled to one vote per Equity Golf Membership held with respect to any matter on which the Equity Golf Members are entitled to vote pursuant to the Articles and these Bylaws.

OC Bylaws at 6.

11. While Community Membership in, and Community Dues paid by Oldfield residential owners is *mandatory* upon obtaining a residence in Oldfield (*See* OC Declaration at 5, Section

3.2), Oldfield residents may *choose* to apply for an Equity Golf Membership and, upon acceptance as an Equity Golf Member, are then mandated to pay Equity Golf Member Dues and obtain voting rights with respect to all issues relating to the Golf Facilities. Community Members have no voting rights with respect to the Golf Facilities. *See* OC Bylaws at 5.

12.    As an Equity Golf Member of OC, such a member must pay annual golf dues and pay assessments related to the maintenance and operation of the Golf Facilities. The Golf Dues are to be applied *only* to OC club facilities (the "**Golf Facilities**"). The Golf Facilities, defined in the Termination Agreement, discussed below, include the 18-hole golf course, golf practice facilities, a Golf House with men's and women's locker rooms, a golf shop, and grill.

13.    "Membership Fees" are defined in the OC Bylaws to mean "the Membership Contribution as well as all dues, assessments and other charges payable to the Club by any Member." OC Bylaws at 3, Section 1.3.

14.    "Membership Contribution" is defined in the OC Bylaws to mean "the purchase price paid by a Member for a specific Membership in the Club." OC Bylaws at 3, Section 1.3.

15.    "Assessments" are addressed in the OC Bylaws in Section 7.3  Section 7.3 states as follows:

> Prior to the Turnover Date, there shall be no assessment of the Members. After the Turnover Date, the Club may assess Equity Golf, Cottage Golf, Corporate Golf, and Community Members, subject to the following:
>
> a.    Any Assessment for capital improvements shall be subject to the approval of at least two-thirds of the Voting Power[6] of Equity Golf, Cottage golf, and Corporate Golf Members and two-thirds of the Voting Power of Community Members, *except that Community Members shall have no right to vote on, and shall not be subject to, any assessment for capital improvements to the Golf Facilities or which benefit only Golf Members.*

---

6

    b.  Any assessment for operating deficits or unbudgeted repairs, maintenance or replacements shall require the approval of a majority of the Voting Power held by Equity Golf, Cottage Golf, and Corporate Golf Members and a majority of the Voting Power held by Community Members, *except that Community Members shall have no right to vote on, and shall not be subject to, any assessment for operating deficits or unbudgeted repairs, maintenance or replacements relating solely to the Golf Facilities or golf operations.*

OC Bylaws at 30, Section 7.3 (emphasis supplied)

16.    The only Membership Classifications authorized in the OC are those set forth in Article II of the Bylaws and as further revised by the Declaration Amendment. *See* OC Bylaws, Article II, Section 2.1(a)("The Club is authorized to issue equity and non-equity Memberships as follow:….(c) Additional Classifications. Until all Authorized Golf-Memberships have initially been sold, the sponsor reserves the right to create additional categories of Membership, provided that the total number of Authorized Golf Memberships is not exceeded. Thereafter, the Board of Directors may create additional categories of Membership by amending these Bylaws in accordance with Section 9.10. Within a Membership Classification, the Board may establish different dues categories based on the Member's status as a Resident or Non-resident, as defined in Section 7.2.")  OC Bylaws at 5-6, Article II.

17.    There is not a single document in the Governing Documents, much less any document produced by the Defendants, which identify a new Membership Classification, other than set forth in Article II of the OC Bylaws and the Declaration Amendment elucidated hereinabove.

18.    On February 20, 2013, TI filed a mandated property report (the "**Property Report**") pursuant to federal law, 15 U.S.C. §1703.[7]  The Property Report represents as follows:

---

[7] ILSA was intended to "protect purchasers from unscrupulous sales of undeveloped home sites" and to "curb abuses accompanying interstate land sales." *Stein v. Paradigm Mirasol, LLC*, 586 F.3d 849, 853 (11th Cir. 2009) (quoting *Winter v. Hollingsworth Props., Inc.*, 777 F.2d 1444, 1448 (11th Cir.1985)). The statute provides:

> Recreational Covenants
>
> A Recreational Covenant for Oldfield Club has been recorded in the Office of the Register of Deeds for Beaufort County, South Carolina.  The Recreational Covenant obligates each property owner to be a Community Member of the Oldfield Club and to pay dues which will entitle the Community Member to use and enjoy the *Social Facilities* of Oldfield Club.

Property Report at 9 (emphasis added).

19.     The Property Report represents that Community Members will have access to the *Social Facilities*, demarcated as: Activity Center with Swimming Pool, Tennis Courts, and Fitness Center, the River House, the Outfitters Center and the Community Dock. Property Report at 19.

20.     The Property Report also represents that:

> Restricted to use by Golf Members.  For Golf Membership, there is currently a Club Membership Contribution of $15,000 due at time of application.  In addition, the Club may establish minimum usage fees to ensure a minimum level of revenue from operations.  *Golf Membership is a completely separate fee structure.*

Property Report at 19 (emphasis added).

---

It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails—
. . .
(2) with respect to the sale or lease, or offer to sell or lease, any lot not exempt under section 1702(a) of this title—
(A) to employ any device, scheme, or artifice to defraud;
(B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or  [*6] subdivision;
(C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser; or
(D) to represent that roads, sewers, water, gas, or electric service, or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed

*Merritt v. Lyons Heritage Pasco, LLC*, No. 8:09-cv-1201-T-27TGW, 2010 U.S. Dist. LEXIS 96509, at *5-6 (M.D. Fla. Sep. 15, 2010)

21.    In or around 2006, the OC Board notified Oldfield Community Members that they would

each be entitled four (4) rounds of golf at the prevailing rate of $109 before noon and $79

after noon; thus, the Community Members were being charged per round, should they choose

to play).  On February 14, 2013, the OC Board notified Community Members that:

> [The four (4) round] offering will be changed effective April 1, to allow for ten
> *complimentary* rounds (including cart fee) per year.
>
> [] Our hope is that with this increased level of access, our current homeowners
> will bring guests and family members to experience Oldfield and this will, to
> some degree, restore those promotional efforts to expose the Club.

Email dated February 14, 2013 from Oldfield Club to Robert Wilson

22.    Consistent with the Declaration Amendment, TI and OC represented since at least 2014

*that <u>none</u> of the Plaintiffs' (and other OCA members') dues* were remitted to the OC for use in

the golf course, golf maintenance or the golf shop.

23.    While the Community Members were granted "**complimentary**" "limited golf access" in

February 7, 2013 (*See Exhibit 1, pp.4-5 to Second Star Affidavit*), by email dated March 4,

2013, OCA Members were assured that "[a]ll Community Dues Income is reflected in the

Administration Department and pays for administration and maintenance of all Club

Facilities, **not the Golf Course, Golf Maintenance or Golf Shop**." (the "**Golf Facilities**")

(*See Exhibit 1, pp.6-7 to the Star Affidavit (annexed hereto as <u>Exhibit 5</u>*).

### A.  <u>Demands by Rob Star</u>

24.    Regardless of the complimentary limited golf access, in March 2013, it was further

represented by Jamie Selby, the OCA and OC General Manager, that "[d]ues for the

Community Membership *are applied only to overhead costs and costs of operating,*

*maintaining and repairing the amenities to which Community Members have access,*

*<u>including **only** the following amenities</u>: Food & Beverage, Sports Center, Outfitters Center,*

*Equestrian, Greeter's Store, Lodging, Facility Maintenance, Membership Department and Administration Departments. Star Affidavit.  Exhibit 1, pp.6-7.*

25.    By email dated March 11, 2013, Phillip Galbreath, a board member and principle of TI (the Oldfield Sponsor), reassured Star's friend Robert Wilson that "you are not subsidizing the golf course with this dues' increase." *Star Affidavit, Exhibit 1, p. 8.*

26.    By letter to the Oldfield Community Counsel (OCC) Board Members, dated May 5, 2013, Star demanded "written assurances that ALL golf overhead, including Administrative costs, annual reserve needs, deferred reserve needs and any and all deferred repairs and maintenance will be the *sole responsibility of the golf members…[w]e are specifically asking for a pledge to the membership that…the Oldfield Club will function as a Club that has a financial firewall between golf and the Community…" Star Affidavit 2, Exhibit 1, pp. 10-12.*

27.    The response to Star's May 5, 2013 letter to the OCC, the OCC stated, among other things, that "*we are unable to provide you any assurances of Club dues not being applied to golf operations.  Whether there should be a "financial firewall" between golfers and non-golfers is not for the Board to decide while the Club is managed by the sponsor….The Board does note the possibility of some Club dues being applied to golf operations, particularly if golf membership revenues do not increase.  Star Affidavit 2, Exhibit 1, pp. 13-15.*

28.    On November 5, 2013, Star joined the Oldfield Finance Committee.  *Star Affidavit 2, Exhibit 1, p.16..*

29.    On November 15, 2013, the OC released the proposed 2014 Budget. *Star Affidavit 2, Exhibit 1, pp.17-21.*  In the 2014 Budget, a line item "Marketing and Advertising Expense," increased by $96,000.00, without any explanation or information addressing the increase.

30.    On July 24, 2014, Richard Price sent an email with "Key Assumptions" regarding the upcoming production of 2015 OC Financials.  The Key Assumptions included in relevant part: "…(2) We will continue to operate as we do today including:…. (d) No additional changes in allocations-Club to OCA and within Club between golf and non-golf;…(4) Further bifurcation of golf/non-golf accounting within Club, essentially treating golf like the OCA (e.g. separate golf and non-golf Reserves)." *Star Affidavit 2, Exhibit 1, p.22.*

31.    On August 7, 2014, the Finance Committee, of which Star was a member at that time, was provided with the proposed 2015 OC Budget with "A Guide to the Club Model" prepared by Richard Price for the Finance Committee. *Star Affidavit 2, Exhibit 1, pp.23-28.*

32.    On September 3, 2014, a so-called "Run 3 Club Model" was distributed to members of the Finance Committee, including Star. For the first time, the financials disclosed a $96,000.00 allocation from OCA Dues was being *"Allocated to Golf," deeming it "hard-wired"* into the budget for 2014 (modified) through 2018.  *Star Affidavit 2, Exhibit 1, pp. 31-32.*

33.    In response to receiving this Run 3 Club Model, Star emailed Richard Price asking:

> Can someone please tell me how we can go forward with this $96K charge to the community members when the golf committee has said they are profitable by that amount?  What happens to that "profit" and if the golf club does not need those funds why aren't they getting redistributed to the Club for other much needed funding?

*Star Affidavit 2, Exhibit 1, pp. 29-30.*

34.    On September 16, 2014, Star demanded a copy of the July 24, 2014 Board Minutes to confirm that Star's objection to the Run 3 Club Model was included.  *Star Affidavit 2, Exhibit 1 at p.33.*

35.    The text of this objection was:

> Please understand why I feel my objection and treatment in the [Financial Committee] meeting needs to be documented. All I seek in this process, at a very important juncture in our community, *is full transparency of all the financials and a complete understanding of the precedent that has been set by TI...*

*Star Affidavit 2, Exhibit 1, pp.33.*

36.    Star's objection, set forth hereinabove, arose from opaque references by Richard Price that the $96,000.00 was "hard-wired" in the 2015 Model budget because it was a "precedent" set by TI.

37.    On June 8, 2016, the "final" 2016 OC budget summary was distributed to Oldfield members. A review of the 2016 <u>Budget reflects that the "hard-wired" $96,000.00 line-item disappeared and appears to be part of the "Marketing & Advertising" line item again</u>. *See Star Affidavit 2, Exhibit 1, pp. 34-39.*

38.    Upon further review of the OC Summary Profit and Loss statement for 2016, it reflects a line item entitled "Marketing and Advertising" in the sum of $134,987.00 (updated). A "comment" adjacent to this line-item states "*[i]ncludes $96K golf course access assessment*." *Star Affidavit 2, Exhibit 1, p.36.*

39.    On November 29, 2016, Star emailed certain OC Board Members asking the following:

> Can you please share with the community where in the documents the Clubhouse overhead can be shifted to the Social Member's P&L? Can you please show where in the docs the OCA should pay any inter-company allocation that pays for the overhead of the Clubhouse? And can you please share with the Members where you are permitted to charge the social members a *marketing fee* for the benefit of the Golf P&L?

*Star Affidavit 2, Exhibit 1, p. 40.*

40.    It is clear from the above recitation of relevant facts and correspondence that the unrequested ten (10) rounds of golf provided to the Social Members of the OC were deemed "**complimentary**" by the OC and OCA's former General Manager, Jamie Selby. That Jaime

Selby represented that OCA Members were assured that "[a]ll Community Dues Income is reflected in the Administration Department and pays for administration and maintenance of al Club Facilities, **not the Golf Course, Golf Maintenance or Golf Shop**." (*See Exhibit 1, pp.6-8 to the Star Affidavit 2*).

41.    It is also clear from the above facts and correspondence, that Board Members of OC, OCC and OCA, and TI in its role of Sponsor, failed to disclose use of Community and Social Member Dues for the Golf facilities, in violation of Section 3.1 of the Declaration Amendment (*Star Affidavit 2, Exhibit 1, pp1-3*) and representations made in the federally mandated Property Report filed with HUD, annexed as *Exhibit 1 (p.19 and 20[8]) to the first Star Affidavit* filed in support of the initial Objection filed to the Motions.

42.    Finally, the above recitation of facts and correspondence *proves* that Community Members *are indeed* being charged for Golf Facilities in violation of the Governing Documents.

43.    After years of falsehoods and obfuscation (see Rob Star Affidavit and Second Rob Star Affidavit), in and around September 2014, the Derivative Plaintiff finally discovered that the Plaintiffs' Social Dues (i.e. non-golf dues) paid to OC were being improperly allocated to the OC Golf Facilities in violation of Section 2 of the Termination Agreement (as more fully set forth, and incorporated herein, in the Plaintiffs' Complaint commencing this Action) and in violation of the OC Declaration, OC Bylaws and HUD Property Report filed by TI in 2013.

44.    Manifestly, viewing all of the Governing Documents and the Property Report together and in their entirety, Derivative Plaintiff assert that it is abundantly clear that Social Members

---

[8] "For Golf Membership…., Golf Membership is a completely separate fee structure…" (p.19).  Under "Who May Use the Facilities," "[y]ou automatically acquire a Community Membership in Oldfield Club at closing and you will be required to maintain it.  This membership permits use of all of the Social Facilities, *but does not permit use of the golf course or golf practice facilities.*(p.20)

may *not* be charged in any way, shape or form to support the Golf Facilities, regardless of the right to play ten (10) rounds of golf offered by the OC (compared with the infinite numbers of rounds of gold all Equity Golf Members may play via their Equity Golf Membership).

### B.  Other Demands by Star and Class A Members

45.     A multitude of "demands" to the OCBOD and OCABOD were also made by Robert Weinfeld, alone, or as part of a collective with other Class A Members (i.e. OC Social Members and OCA Community Members (but not including non-golf members), including the Derivative Plaintiff.

46.     First, Derivative Plaintiff directs this Court to the correspondence filed with his Amended Complaint and Derivative Plaintiff's First Objection to the first Motions to Dismiss the original Complaint and requests the Court take judicial notice of said correspondence (ECF Doc. Nos. 36 and 52, with filed Exhibits).

47.     Second, the Derivative Plaintiff collectively annexes hereto as **<u>Exhibit 6</u>**, *marked* correspondence reflecting the pre-litigation demands by Mr. Weinfeld and other OC and OCA members, annexed as Exhibit 6 hereto.

48.     A review of the correspondence in Exhibit 6 reflects that demands *were made directly to OCBOD and OCABOD* (*See ECF Doc. 36-8 for a list of all persons sitting on the OCBOD and OCABOD, and their corresponding dates of such tenure)* demanding:

    i.   Transparency regarding the sale by TI of lots to BEP under a secret agreement depriving the OC of Social Dues from BEP from 2013 through November 2017; Transparency relating to financial assessments at the time of Turnover by TI; Transparency regarding application of Social Member Dues to Golf Facilities; Transparency regarding the TI sale of the Greeter's Store to Selby/EGH; Transparency regarding the State Court Action by Selby;
    ii.  Direct action against TI and BEP (as directors of the OCBOD and OCABOD) to ascertain a copy of the "secret agreement" selling TI lots to BEP, and to seek

recovery of over what is now $2 million in unpaid dues by BEP based upon claims that TI could not transfer "declarant" rights without the corresponding obligations[9];

iii. Direct Action to against TI and BEP for breach of fiduciary duty as directors of the OCBOD and OCABOD, and breach of fiduciary duty against TI as a developer of a planned unit development (*Goddard v. Fairways Dev. Gen. Partn.*, 310 S.C. 408, 426 .E.2d 828 (Ct. App. 1993) arising from, among other things, the secret BEP deal and the secret sale of the Greeter's Store (encompassed in a legal opinion written by Ian Ford, Esq. when he served as counsel to the OCC (he now serves as counsel to the OC (*See Exhibit 6, Bates Stamp Savage 000056-000063*);

iv. That Ian Ford, Esq. not represent the OC due to his conflict of interest;

v. That an outside party (e.g. a receiver) review the financials and acts by the OCABOD and OCBOD;

vi. That the OCBOD and OCABOD (both pre- and post-turnover) sue themselves for breach of fiduciary duty arising from the Boards' failure to pursue BEP for past due dues and objecting to its purported "declarant" status as a justification for not paying fees; TI for its secret and illegal transfer of lots to BEP without the accompanying duty of OC dues payment; negligent misrepresentation of the BEP deal; misrepresentation of applicability of OC Social Member's dues to Golf Facilities; failure to provide access to books and records; failure to undertake action to modify the Governing Documents to address the unconscionable and prejudicial provisions of these adherence contracts to the OC and OCA members;

---

[9] *See Agreement for Transfer of Assets By and Between Oldfield, LLC and Oldfield Club*, annexed hereto in relevant part, and made a part hereof as **Exhibit 2**, and wherein, pursuant to Section 7.7, it states "The Sponsor may assign or delegate its rights, duties **and** obligations under this Agreement without the Club's Consent." The use of the word "and" is conjunctive and thus requires the rights, duties and obligations to be transferred as a whole.

**Conjunctive Versus Disjunctive**
When you see a list in a statute, the items are generally joined either by the term "and" or the term "or." If they are joined by "and," the statute is conjunctive. If they are joined by "or," the statute is disjunctive. In conjunctive statutes describing the elements of a crime, for example, every single item on the list must be proved for someone to be found guilty of that crime. In disjunctive statutes, proof of any one of the elements is sufficient.

**Examples of Conjunctive and Disjunctive Statutes**
One federal statute regarding assault on a mail carrier begins: "(a) Assault. A person who assaults any person having lawful charge, control, or custody of any mail matter or of any money or other property of the United States..." The use of the word "or" in this statute means that you can be charged with the crime if you assault a person in control of any one of the items listed: mail or money or property of the United States. If the term "and" were used, you could only be charged for assault under this law if you had done each and every one of the actions listed.
https://legalbeagle.com/8535279-determine-statute-conjunctive-disjunctive.html

A document executed by and among BEP Oldfield, LLC (as the buyer of the BEP Lots, and TI Oldfield Development, LLC and TI Oldfield Operations, LLC (as seller of the BEP Lots) discloses that even BEP was concerned that, and believed it would be adversely affected, if TI sold or assigned the rights of the "Declarant" or transferred of the rights of the "Sponsor." *See Memorandum of Agreement Requiring Notice of Transfer of Rights of Title, annexed hereto and made a part hereof as* **Exhibit 7**. Thus, pursuant to this Memorandum, TI agreed that it would notify BEP of any such proposed transfer to ensure any successor abided by the terms of the sale of the BEP Lots.

vii.   Indemnification against TI and the SF Companies with respect to any damages arising from the Selby State Court Action;

viii.  Pursuit of TI and BEP due to conflicts of interest in violation of SC Code Section 33-31-831, as TI and BEP were the only board members to benefit from the BEP secret sale and waiver of OC dues; Demands to pursue TI, as TI was the only beneficiary of the secret Greeter's Store sale and engaged in illegal conduct in transferring an OCA asset;

ix.    The OC and OCA boards pursue claims against TI for theft of services via use of OC and OCA assets for TI's sole benefit;

x.     That the OC and OCA pursue claims against TI for the filing of the Deceptive and Inaccurate Property Report under 15 U.S.C. §1701, et.seq.;

xi.    Commencement of actions against pre- and post-turnover OC and OCA directors arising from *ultra vires* acts including, but not limited to all of the above referenced claims.

## ARGUMENT

### a.   Demands were made pursuant to FRCP 23.1

In *In re SCANA Corp. Derivative Litig.,* 2018 U.S.Dist. LEXIS 107042 (D.S.C. 2018), on a motion to dismiss by defendants, the District Court denied the motions to dismiss ruling as follows:

> The derivative form of action permits an individual shareholder to bring "'suit to enforce a corporate cause of action against officers, [*7] directors, and third parties.'" Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95, 111 S. Ct. 1711, 114 L. Ed. 2d 152 (1991)(quoting Ross v. Bernhard, 396 U.S. 531, 534, 90 S. Ct. 733, 24 L. Ed. 2d 729 (1970)). The purpose of a derivative action is to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers. Id. (quoting Cohen v. Beneficial Loan Corp., 337 U.S. 541, 548, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949)). To prevent abuse of this remedy, the shareholder must first demonstrate "'that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions.'" Id. at 95-96 (quoting Ross, 396 U.S. at 534). Consequently, Rule 23.1(b)(3), which governs the pleading requirements in derivative actions, states that a plaintiff's verified complaint must:
>
>> (3) state with particularity:
>>     (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and
>>     (B) the reasons for not obtaining the action or not making the effort.

*In re SCANA Corp. Derivative Litig.*, No. 3:17-3166-MBS, 2018 U.S. Dist. LEXIS 107042, at *6-7 (D.S.C. June 27, 2018). *Accord Carolina First Corp. v. Whittle*, 343 S.C. 176 (Ct.App.2000).

Here, as discussed hereinabove and annexed to this Objection and documents referenced in this Action containing additional demands, voluminous demands have been made on the OCABOD and OCBOD relating to the Unasserted Claims by both the Derivative Plaintiff and other members of OC and OCA. Each of the "demands" viewed individually or collectively, state with particularity (a) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (b) the reasons for not obtaining the action or not making the effort or the failure of the OCBOD and OCABOD to respond to said demands with other than a rejection out of hand.

The Special Master appeared to hold the Derivative Plaintiff to an arbitrary, bright line "demand" threshold that required "formal" demand be made on the Boards. Thus, the Special Master disregarded the multitude of "demands" made by the Derivative Plaintiff and a number of other Social Members to directors of the OCBOD and OCABOD via email and letter.

Further, though arguments were also asserted at the Hearing, by the Derivative Plaintiff, **that other OC and OCA members whose demand correspondence was annexed to the Amended Complaint and to the Derivative Plaintiff's Objections to the Dismissal Motions (and such persons were present at the Hearing to affirm said assertions)** that also served as requisite "demands" under FRCP 23.1(b), the Special Master determined the non-Derivative Plaintiff "demands" (the "**Other Demands**") did not constitute "demands" under FRCP 23.1(b) for purposes of maintaining the Amended Complaint and, in the face of other member representations at the hearing that they would be willing to join the action via a Second Amended Complaint, the Special Master disregarded this basis upon which a Second Amended Complaint

would be filed, and nonetheless concluded that filing a Second Amended Complaint would be futile.

The conclusion that the "Other Demands" could not be considered part of the universe of demands in the Derivative Plaintiff's action is at odds with rulings by courts around this Country. In *Mullins v. De Soto Sec. Co*, 3 F.R.D. 432 (D.La 1944), the Court determined that a shareholder who commenced a derivative action against the corporation did not have standing to continue the action because he did not own stock at or after the time of commencement of the action. Three other shareholders, who could demonstrate standing via their stock holdings sought to intervene in the action, though they did not make the requisite "demands" required to commence a derivative action.

The *Mullins* Court held the three current stockholders may intervene for the following reasons and without having to make "demands," as such demands were made by the original derivative plaintiff:

> There is a strong school of thought, and it may become the dominant one, recognizing that the date of acquisition of the plaintiff's share is a matter of no importance to a representative [**7]  action. *See Ballantine on Corporations*, 1927, pp. 124-626; *Jablow v. Agnew*, D.C., 30 F.Supp. 718; *Hand v. Kansas City Southern R. Co.,* D.C. S.D.N.Y., 55 F.2d 712.

> The reasoning of this new theory is strongly given in Morawetz, <u>Private Corporations</u>, vol. 1, 2d Ed., Sec. 265:

>> "It has been pointed out that the estate of a corporation is to be treated as that of a continuing institution, irrespective of the members at any particular time composing it. Each share represents an interest in the entire concern, and the several holders are entitled to equal rights, irrespective of the time when they acquired their shares. Causes of action belonging to the corporation increase the value of the corporate estate, and must be treated like any other assets; when enforced, they inure to the benefit of all the shareholders without distinction. It is plain therefore, that a shareholder has an interest in all causes of action belonging to the corporation, whether they arose before or after he purchased his shares."

> And in Section 266 the author continues:

"There seems to be no good reason why a shareholder should not, as a rule, be permitted to sue on account of causes of action which arose [**8] before he purchased his shares, it being assumed, of course, that the corporation ought to sue, but is unable to act. If purchasers were disqualified from protecting their interests under these circumstances, the transferable value of shares might be impaired, and the loss would fall upon the innocent holders who were wronged."

Further reasoning is found in 21 Harvard Law Review 195 (1907):

"It is difficult to suggest any sound theory whereby a stockholder suing in behalf of the corporation, and whose litigation if successful redounds to the benefit of all stockholders, should have an arbitrary limitation placed upon his right to sue. Corporate stock entitles the owner to share in all of the corporate assets, among which must be counted causes of action belonging to the corporation, and one of the most characteristic benefits of corporate organization is the continuing estate thereby created. The stockholder has no right to any specific part of the corporate assets; his rights are those ordinarily possessed by the holder of a chose in action, which in the end are litigious rights. Again, the transferable value of shares is impaired if once it be understood that a transfer operates [**9] to cut off rights which the transferor would have had, and wrongs are imposed on purchasers who only on becoming shareholders can inspect the books of the company or otherwise, as matter of right, examine into corporate transactions. This is an answer, also, to the suggestion that a person purchasing stock should take the corporate situation as he finds it: why should he do so when he buys in ignorance of wrong done, and why should wrongdoers be given a shield against attempts to right the wrongs?"

*Mullins v. De Soto Sec. Co.*, 3 F.R.D. 432, 434 (W.D. La. 1944)

*The necessity of demand by the applicants for intervention to the officers of the corporation is an unnecessary requirement to impose on the applicants in the face of the full demand by the original plaintiff and the unqualified refusal of this demand for redress by the officers of the corporation.*

*Mullins v. De Soto Sec. Co.*, 3 F.R.D. 432, 435 (W.D. La. 1944)(emphasis added). *Accord*

*Kellmer v.* Raines, 674 F.3d 848 (D.C.C. 2012); *Pikor v. Cinerama Productions Corp.*, 25 F.R.D.

92 (S.D.N.Y. 1960); *In re M&F Worldwide Corp. S'Holders Litig.*, 799 A.2d 1164 (Ct. Chan.

2002); *Duncan v. National Tea Co.*, 14 Ill.App.2d 280 (App. Ct, 1st Dist. 1957).

The Federal Rules of Civil Procedure require a shareholder bringing a derivative suit to have been a shareholder at the time of the challenged transaction and that [**14] the shareholder "fairly and adequately represent the interests of shareholders." Fed. R. Civ. P.

23.1. As discussed above, Grucel has sold his shares of stock in Extreme. The sale of his stock renders Grucel without standing to maintain this action. *Johnson v. United States,* 317 F.3d 1331, 1333-34, 52 Fed. Appx. 507 (Fed. Cir. 2003) ("when a plaintiff bringing an action on behalf of the corporation is the legal owner of the stock at the time of filing but does not maintain shareholder status throughout the course of litigation, the plaintiff no longer has standing to bring the action").

Although Grucel can no longer proceed with this action, *another qualified shareholder can intervene on the grounds that their rights are no longer represented. Malcolm v. Cities Serv. Co.,* 2 F.R.D. 405, 407 (D. Del. 1942). "The cause of action, if there be one, remains unaffected by the sale of the plaintiff's stock." *Id.; see also Pikor v. Cinerama Prod. Corp.,*25 F.R.D. 92, 94-95 (S.D.N.Y. 1960**)**. Grucel's lack of standing is fatal to the operative complaint, however, the presence of other plaintiffs as well as other shareholders seeking to intervene dictates that the dismissal be without prejudice. *See Pikor,* 25 F.R.D. at 95.

*In re Extreme Networks, Inc.*, 573 F. Supp. 2d 1228, 1237 (N.D. Cal. 2008).

A derivative claim belongs to the corporation, not to the shareholder plaintiff who brings the action. *Taormina v. Taormina Corp.,* Del. Ch., 32 Del. Ch. 18, 78 A.2d 473, 475 (1951). The shareholder plaintiff's interest is limited to compelling the corporation (by "standing in its shoes") to assert the corporation's right to seek redress for the alleged wrongdoing. *Id.; Cantor v. Sachs,* Del. Ch., 18 Del. Ch. 359, 162 A. 73, 76 (1932). The stockholder plaintiff's claim for redress [**22]  in a derivative action is not personal. It is derivative, and exists solely because of the plaintiff's interest as a shareholder. *Eshleman v. Keenan,* Del. Ch., 22 Del. Ch. 82, 194 A. 40, 42 (1937), *aff'd,* 23 Del. Ch. 234, 2 A.2d 904 (1938). **Because the corporation is always the real party in interest, the identity of the specific representative shareholder plaintiff is not a paramount concern. Thus (and to reiterate) in derivative actions where the original plaintiff never had proper standing or lost standing after the action was filed, courts have permitted intervention as a means to cure the standing defect.** *See, e.g., Hutchison v. Bernhard,* Del. Ch., 43 Del. Ch. 139, 220 A.2d 782 (1965); *Truncale v. Universal Pictures Co.,* 76 F. Supp. 465 (S.D.N.Y. 1948); *Pikor v. Cinerama Productions Corp.,* 25 F.R.D. 92 (S.D.N.Y. 1961).

In *Truncale, supra,* a shareholder moved to intervene in a derivative suit in which the original shareholder plaintiff lacked standing from the outset. Judge Simon Rifkind, confronted with the defense that a shareholder cannot intervene in a "non-suit," rejected that position out of hand:

An application has been made … for leave to intervene.  [**23] Defendants oppose the application. They assert that since plaintiff Truncale is not entitled to institute this action, there is in fact no action pending in which intervention may be granted.
 [*957]  The history and purpose of the Federal Rules are antagonistic to any such technical limitation upon a course of action obviously designed to save time and

money. A denial of [the intervenor's] application and a dismissal of [the] complaint would not prejudice the institution of a new suit by [the intervenor]. I see no reason for encouraging the delay and duplication a denial of the application would entail. 76 F. Supp. at 471.

The reasoning in *Truncale* was followed in *Pikor,* where a shareholder of a New York corporation was permitted to intervene in a derivative action that the original plaintiffs lacked the capacity to bring. *The court in Pikor held that because the claim belonged to the corporation, a specific shareholder plaintiff's standing deficiency could not extinguish the cause of action being asserted on the corporation's behalf. The court stated:*

> '*The extinction of the status of [the] plaintiffs ... in no way impaired or affected the corporation's [\*\*24] cause of action or its right to continue and prosecute the action. In legal effect, it is as if the [original plaintiffs] had never appeared or instituted the action but as if the corporation alone was the plaintiff and alone had brought the suit.*'

*Pikor,* 25 F.R.D. at 95 (quoting *Kantor v. Stendig,* 190 Misc. 861, 76 N.Y.S.2d 284, 286 (Sup. Ct. Special Term N.Y. Co. 1947)).

The rationale of *Pikor* and *Truncale* is consistent with Delaware's concept of a derivative action, as evidenced by *Michelson v. Duncan,* 1980 Del. Ch. LEXIS 511, \*5, C.A. No. 5052, [\*\*25] Hartnett, V.C. (April 1, 1980). In *Michelson,* Vice Chancellor (now Justice) Hartnett permitted a shareholder to intervene in a derivative action where the original plaintiff lacked standing to prosecute the claims. The Court granted the intervenor's Rule 24(a) motion as a matter of right, finding that no existing party to the litigation could protect the intervenor's interests. At a minimum, *Pikor* and *Truncale* and their progeny, together with *Michelson,* fatally undercut the defendants' position that intervention is precluded as a matter of law.

*NL Indus. v. MAXXAM, Inc. (In re MAXXAM, Inc./Federated Dev. S'holders Litig.)*, 698 A.2d

949, 956-57 (Del. Ch. 1996)(emphasis added).

Thus, the *Mullins* case, and its progeny, by extension, make clear that if a shareholder

who owns stock at the time a derivative action is commenced (and thus also satisfied the

"demand" requirement of 23.1(b) and its predecessor statute) sells his stock and loses standing to

pursue the derivative action, and another stockholder who has standing by virtue of his

ownership of stock may "replace" the original derivative plaintiff (i.e. piggyback on the original

derivative plaintiff's claim and demands), then the original derivative plaintiff should surely be

able to piggyback on demands made by other shareholders if this Court determines that the Derivative Plaintiff failed to make adequate "demands" on the OC and OCA boards.

### b. *Cui Bono? Who Benefits from the Board's inaction?*

Who benefits from the secret deals by TI, BEP, Selby and the Equity Golf Members? Clearly TI, BEP, Selby and the Equity Golf Members. Why? TI received over $4 million collectively from these secret deals and, it is alleged by the Derivative Plaintiff, violated the Governing Documents by (a) transferring the BEP Lots to BEP as "Declarant" without the attendant obligations and liabilities under the OC Recreational Declaration and Transfer Agreement and (b) transferring the Greeter's Store to Selby/EGH alleging it was an asset of OC, when the Governing Documents make clear that the Greeter's Store was an asset of OCA. TI has superveto power over all decisions by the OCA and OC Boards as their vote is weighted by virtue of the number of units of property TI still owns and pursuant to its power under Section 7.7 of the Transfer Agreement. Further, BEP's seat on the OC and OCA boards is also weighted by the 108 properties they own. The other OC Board members are comprised of four (4) golf members (admitted to at the Hearing by the Defendants) who each own their respective properties, and two (2) social members, who own their respective properties.

Ultimately, the Social Members are underwriting the losses via increased Social Member Dues, which such losses are incurred by BEP's failure to pay OC Social Dues; yet TI sits pretty with its $2 million that it received from BEP for the BEP Lots.

The Equity Golf Members benefit because the Golf Facilities deficiencies are being funded by the OC Social Members. The OC and OCA boards refuse to take any steps to stop the ultra vires misappropriation of OC Social Member Dues for use to support the Golf Facilities. So, the Equity Golf Members have no incentive to vote to stop the misappropriation of Social

Members' Dues because they are not sure they will ever recoup funds that the OC Board is seeking from TI.

BEP has also obtained even further benefits from the OCA Board and the OC Board via an agreement (the "**BEP/OC/OCA Agreement**"), dated July 6, 2018 (the *same* date that the Hearing took place before the Special Master on the Motions to Dismiss) executed by and among the OC, OCA and BEP, annexed hereto and made a part hereof as **Exhibit 8.**

In the BEP/OC/OCA Agreement, the OC and OCA concedes and agrees that BEP is a "Declarant" under the OC Recreational Covenant and states (in the face of the Derivative Plaintiff's pending action against BEP to recover dues since 2013 and have this Court, *inter alia*, exclaim that BEP may not be a "Declarant" under the relevant Governing Documents) that "[a]s the Declarant under the Recreational Covenant, BEP is currently exempt from payment of Membership Fees under the Recreational Covenant on the Lots." BEP/OC/OCA Agreement at 1.

The BEP/OC/OCA Agreement is a slap in the face not only to the Derivative Plaintiff and Social Members that the Derivative Plaintiff represents ("The purpose of a derivative action is to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." *Scana, supra.* at 2018 U.S. Dist.LEXIS 107042, *7-8), but also to this Court, given the pending Derivative Action which the BEP/OC/OCA Agreement obviously seeks to moot with respect to the Derivative Plaintiff's claims against BEP.

Further, the BEP/OC/OCA Agreement further compels the OC and OCA to fund (from Social Member's Dues and Community Dues) over $250,000 in marketing costs to market…the BEP Lots. This agreement is reprehensible and was rejected by Social and Community Members when proposed 2 years ago by the Boards.

Thus, BEP, TI and the Equity Golf Members who collectively control the OCBOD and OCABOD are not "disinterested directors" under SC Code Section 33-31-831.

### c. *Even if the Court concludes no requisite demands were made, it is clear any such demands would be futile*

In *Scana, supra.*, the District Court of South Carolina, following *Carolina First Corp. v. Whittle*, 343 S.C. 176 (S.C. Ct. App. 2000), states that South Carolina applies Delaware Law in analyzing futility. *Scana, supra,* at *8.

Thus, *Scana* applies the Rales and Aronson Tests for determining demand futility. *Id.*

The Rales Test mandates that if a plaintiff challenges the board's failure to act, "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, [a majority of] the board of directors could have properly exercised its independent and disinterested business judgment in responding to the demand." Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993).

A director is considered interested where "he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." Id. at 936. A plaintiff can also establish a director is interested by alleging conduct "so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of [personal] director liability therefore exists[.]" *In re Citigroup S'holder Derivative Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009). This is so because there is "presumptively a reason to doubt that a [*9] director who faces a substantial likelihood of personal liability could be disinterested when responding to a demand." Id. *In re SCANA Corp. Derivative Litig.*, No. 3:17-3166-MBS, 2018 U.S. Dist. LEXIS 107042, at *8-9 (D.S.C. June 27, 2018)

The Special Master concluded that the Derivative Plaintiff failed to carry its burden of proof under the Rales Test.

The Aronson Test mandates that if the plaintiff challenges a specific board decision, the court must determine "whether, under the particularized facts alleged, a reasonable doubt is created that a majority of the directors: (1) are disinterested and independent **or** (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814. The business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Id. at 812. The prongs of the *Aronson* test are in the disjunctive; therefore, if plaintiff creates a reasonable doubt as to either prong of the test, demand is excused. *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000).

Without any analysis, the Special Master concluded the Derivative Plaintiff failed to carry its burden of proof under the Aronson Test.

It is clear from the facts and law alleged in the Amended Complaint and hereinabove, that as of the time the Derivative Action herein was filed, [a majority of] the board of directors could not have and did not properly exercise its independent and disinterested business judgment in responding to the demand." The execution of the BEP/OC/OCA Agreement since the filing of the Derivative Action is a mere example of the OC and OCA Boards failure to exercise independent and disinterested business judgment.

It is clear from the facts and law alleged in the Amended Complaint and hereinabove, that the acts of a majority of votes on the OC and OCA Boards are not independent and disinterested. Moreover, it is clear from the facts and law alleged in the Amended Complaint and hereinabove, that a reasonable doubt is created that a majority of the directors the challenged transaction was otherwise the product of a valid exercise of business judgment.

The Special Master concluded that the OCBOD and OCABOD exercised valid business judgment. However, this finding is erroneous *because the acts alleged by the Derivative Plaintiff in the Amended Complaint are ultra vires in nature and thus, the business judgment rule is **not** applicable to the claims made by the Derivative Plaintiff.* Seabrook Island Property Owner Asso. v. Peltzer, 292 S.C. 343, 347 (Ct. App. 1987).

Accordingly, the Derivative Plaintiff has satisfied his burden of proof with respect to both prongs of the Aronson Test.

Having satisfied the Rales and Aronson Tests, the Derivative Plaintiff has demonstrated the futility in making any demands relating to the claims set forth in the Amended Complaint and, to the extent this Court concludes the Demands by Star and the Other Demands by other OC and OCA members are inadequate, the Derivative Plaintiff respectfully submits that such demands would have been futile in any event.

> **d.  The RICO claim is properly pled, with or without a demand on the Boards and All Claims set forth in the Amended Complaint must be included to demonstrate a pattern of conduct and predicate acts to support the RICO Claim**

The Special Master concluded that the Derivative Plaintiff failed to make adequate demands of the OC and OCA boards to commence a RICO claim against TI.

First, the bottom line is that the RICO claim is a damage statute, essentially permitting a Plaintiff to allege claims for fraud (from which the Derivative Plaintiff or the OCBOD and OCABOD could obtain actual and consequential damages), and compile them to demonstrate a pattern of predicate acts supporting an award of treble damages under the RICO statute which are punitive in nature.

As such, no demand had to be made by the Derivative Plaintiff to seek punitive damages and ultimately, it is clear from the discussion regarding the Rales and Aronson tests that such demands would have been futile.

Second, allegations of fraud pled as the basis of a RICO claim must meet the heightened pleading requirements set forth in Rule 9(b) of the Federal Rules of Civil Procedure. *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (*citing Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400-01 (9th Cir. 1986) ("plaintiff must plead 'circumstances of the fraudulent acts that form the alleged pattern of racketeering activity with sufficient specificity  [**5] pursuant to Fed. R. Civ. P. 9(b)'")). Rule 9(b) states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Jones v. Ram Med., Inc.*, 807 F. Supp. 2d 501, 507 (D.S.C. 2011).  Thus, contrary to the Special Master's finding, to satisfy FRCP 9 pleading requirements, the Derivative Plaintiff must include all the claims set forth in the Amended Complaint as a pattern of predicate acts to sustain a civil RICO claim.

### e.   *Amending the Amended Complaint would not be futile*

As set forth hereinabove, to the extent the Court determines that the demands by Star were inadequate to satisfy SCRCP 23.1(b), and the Court rejects the decisions in *Mullins, supra.* and its progeny, the Derivative Plaintiff asserts that amending the Amended Complaint to add additional Oldfield member plaintiffs who sent the Other Demands, would collectively satisfy the SCRCP 23.1(b) demand requirement, thus maintaining the Derivative Action against the Defendants.

### CONCLUSION

Based upon the foregoing, the Derivative Plaintiff respectfully requests that this Court reject the findings by the Special Master in her Recommendations, deny the Motions to Dismiss filed by the Defendants and/or enter an order authorizing the Derivative Plaintiff to file a Second Amended Complaint in conformance with this Court's findings.

Date:    August 13, 2018
         BEAUFORT, S.C.

                                    s/ Denise L. Savage
                                    Denise L, Savage, Esq.
                                    South Carolina Bar No. 102567
                                    **Savage Law, PLLC, Attorneys for Rob
                                    Star, Derivative Plaintiff**
                                    500 Carteret Street
                                    Beaufort, South Carolina 29902
                                    Phone: (843) 522-0058
                                    Fax: (843) 522-2152
                                    Email: dsavage@savagelitigation.com